## Case No. 11,641.

### REED et al. v. CANFIELD.

[1 Sumn. 195.] [1]

Circuit Court, D. Massachusetts. Oct Term, 1832.[2]

SEAMEN—RIGHT TO BE CURED—WHALING VOYAGE.

1. A seaman, whose feet are frozen while in the ship's boat in the service of the ship, before he is discharged from the ship on the return voyage, at the home port, is entitled to be cured at the ship's expense; and it is a charge on the ship.

[Cited in Davis v. The Erie, Case No. 3,632a; Nevitt v. Clarke, Id. 10,138; Ringold v. Crocker, Id. 11,843; The Atlantic, Id. 620; The Ben Flint, Id. 1,299; Neilson v. The Laura, Id. 10,092; Brown v. The Bradish Johnson, Id. 1,992; Peterson v. The Chandos, 4 Fed. 651, 654; Longstreet v. The R. R. Springer, Id. 672; The City of Alexandria, 17 Fed. 393; The W. L. White, 25

[1] [Reported by Charles Sumner, Esq.]
[2] [Affirming Case No. 2,381.]

Fed. 504; The Lizzie Frank. 31 Fed. 481; The City of Carlisle, 39 Fed. 816. Criticised in The J. F. Card. 43 Fed. 93. Cited in The A. Heaton, Id. 596.]

[Cited in Holt v. Cummings, 102 Pa. St. 217; Scarff v. Metcalf. 107 N. Y. 216. 13 N. E. 796; Thompson v. Hermann, 47 Wis. 610, 3 N. W. 583.]

2. Quære. How.it would be in a case of extraordinary service to the ship, in the nature of a salvage service. Would it be a general average?

[3. Cited in Lewis v. Chadbourne. 54 Me. 485, to the point that although in whaling voyages sailors usually have a certain lay or share in the proceeds as wages, and that their compensation is therefore contingent and dependent upon their success; yet nevertheless they are never regarded as partners, although participating in the profits of the voyage.]

[Appeal from the district court of the United States, for the district of Massachusetts.]

This was the case of a libel in personam, filed [by William Canfield] against [Sheffield Reed and others] the owners of the ship Albion, of New Bedford, belonging to the original respondents, (now appellants,) for compensation for expenses incurred in curing the libellant, who was a seaman on board of the ship, and severely injured, as is alleged, while in the service of the ship. The facts are, that the Albion was engaged in the whale fishery, and, being on her return from a voyage in the Pacific, came to anchor on the 17th of February, 1831. nearly opposite the light-house on Clarke's Point, in New Bedford, the port of her destination. The master soon afterwards landed at Fairhaven, and gave permission for one of the mates also to go on shore. Both of the mates expressed a desire to avail themselves of this permission on the return of the boat from landing the master. They finally both concluded to go ashore,[3] taking with them a boat's crew who were volunteers for the occasion, and on whom they could rely with confidence, that they would return on board of the ship that evening in proper season. Among the boat's crew on this occasion was the libellant, and one Winslow, a boat-steerer. They landed at New Bedford between seven and eight o'clock in the evening; and the boat's crew, after taking supper at the house of some of Winslow's friends, returned at a later hour (the precise time is a matter of considerable doubt) to the boat, and departed for the ship. Soon after they had left the shore, there was a great change in the wind and weather; the cold became intense; they were surrounded and entangled in drifting ice; and were unable to reach the ship. After many unavailing efforts for this purpose, they were driven out into the bay, and remained there enclosed in ice, and suffering extremely from the cold, until the following night, (18th of February,) about midnight, when they were relieved from the shore. The libellant was the greatest sufferer; and his feet were so

---

[3] This was pronounced by the court. a most unwarrantable departure from their duty.

severely frozen, that an amputation of his toes became necessary; and he has ever since been a cripple, and for more than a year afterwards was under the care of a physician, requiring constant medical aid, diet, nursing. and other assistance. It is for the expenses so incurred, that the present libel was brought. [From an amount of $415.11 damages and costs of suit, awarded by the district court (Case No. 2,381) defendants appealed.]

Fletcher & Simmons. for respondents.
Mr. Dunlap, Dist. Atty., for libellant.

STORY, Circuit Justice. This libel presents a case somewhat novel in the annals of our maritime jurisprudence. Upon the more general question suggested upon the posture of the facts, I have no difficulty. I am clearly of opinion, that a seaman, .who is taken sick, or is injured, or disabled in the service of the ship, without any fault on his own part, is by the maritime law entitled to be healed at the expense of the ship. I do not go over the authorities on this subject. They will be found in some measure collected in the opinion delivered in Harden v. Gordon [Case No. 6,047], to which I deliberately adhere. So far as any act of congress has changed or modified the principle of the maritime law, it is to be deemed, pro tanto, repealed; so far as it stands unaffected by any such legislation, it is to be followed out to all its just results.

Various objections to the claim have been made on behalf of the respondents. It has been said, that there is no case of any claim in the admiralty for compensation after the voyage has been performed, and the party has been discharged from the ship; and in the present case, the voyage terminated, and the party was lawfully discharged in a day or two after the accident. But upon this point it is unnecessary to say more. than that, if the principle of the maritime law extends to cases circumstanced like the present, the admiralty is perfectly competent to administer a suitable remedy; since its jurisdiction attached to it as a right, while the party was in the maritime service; and the extent of the compensation is but an incident to the possession of the principal claim. It is but an ascertainment of damages, flowing from a claim of admiralty and maritime jurisdiction.

Another objection is, that the maritime law applies only to sickness. and accidents, and injuries occurring in the ship's service during the voyage abroad, and not, when she is in the home port, either at the commencement or termination of her voyage. But I know of no such qualification ingrafted upon the rule of the maritime law. It embraces all sickness, and all injuries. sustained in the service of the ship, and while the party constitutes one of her crew, without in the slightest manner alluding to any difference be-

tween their occurring in a home or in a foreign port, upon the ocean, or upon tide-waters. Lord Tenterden, in his excellent treatise on Shipping, lays it down generally, "that by the ancient marine ordinances, if a mariner falls sick during the voyage, or is hurt in the performance of his duty, he is to be cured at the expense of the ship; but not, if he receives an injury in the pursuit of his own private concerns." And he is fully borne out in this statement by the language of the ordinances cited by him on this occasion. See Laws of Oleron, art. 6; of Wisbuy, art. 18; of the Hanse Towns, art. 39; 2 Pet. Adm. Append. p. 14; Id. 74; Id. 105. Indeed, the 18th article of the Laws of Wisbuy expressly declares, "that a mariner, being ashore in the master's or the ship's service, if he should happen to be wounded, he shall be maintained and cured at the charge of the ship." The commercial law of France furnishes an equally liberal rule, both in its ancient and modern codes. See 1 Valin, Comm. lib. 3, p. 72, tit. 4, art. 11; Code Com. arts. 262, 263. 2 Pet. Adm. Append. p. 33, art. 11. Cleirac, Us et Coutumes de la Mer. p. 31; Jugemens d'Oleron, p. 18, arts. 6, 7. The voyage of the ship must, so far as the seamen are concerned, be deemed to commence, when they are to perform service on board, and to terminate, when they are discharged from farther service. The title to be cured at the expense of the ship is co-extensive with the service in the ship. The seaman is to be cured for injuries and sickness occurring, while he is in the ship's service. It is the benefit from the service, which constitutes the ground-work of the claim. And I am wholly unable to perceive any principle, upon which a distinction can be maintained between a service in a foreign and a home port.

It has been suggested, that a seaman at home cannot be entitled to any claim against the owners of the ship for injuries received in the ship's service, any more than a mechanic or manufacturer at home for like injuries in the service of his employer. If the maritime law were the same in all respects with the common law, and if the rights and duties of seamen were measured in the same manner, as those of mechanics and manufacturers at home, doubtless the cases would furnish a strong analogy. But the truth is, that the maritime law furnishes entirely different doctrines upon this, as well as many other subjects, from the common law. Seamen are in some sort co-adventurers upon the voyage; and lose their wages upon casualties, which do not affect artisans at home. They share the fate of the ship in cases of shipwreck and capture. They are liable to different rules of discipline and sufferings from landsmen. The policy of the maritime law, for great, and wise, and benevolent purposes, has built up peculiar rights, privileges, duties, and liabilities in the sea-service, which do not belong to home pursuits. The law of the ocean may be said in some sort to be a universal law, gathering up and binding together what is deemed most useful for the general intercourse, and navigation, and trade of all nations. Who ever heard of salvage being allowed for saving property on land? Who ever heard of any civilized nation, which denied it for salvage services at sea, or on the sea-coast? It is impossible, therefore, with any degree of security, to reason from the doctrines of the mere municipal code in relation to purely home pursuits, to those more enlarged principles, which guide and control the administration of the maritime law.

It is said, that the acts of congress respecting hospital money, and the relief of sick and disabled seamen, provide suitable means for the relief of seamen in the home ports; and therefore may be deemed to supersede the maritime law, even if it reaches to relief in cases like the present. But it appears to me, that they are rather to be deemed auxiliary to the maritime law. They reach cases, where the maritime law gives no relief; and are far different in their scope and operation from mere cases of injuries and sickness, while in the ship's service. They are founded upon the great national policy of providing means for the relief of seamen, who are sick and disabled, by withdrawing a small fund, from time to time, from their maritime earnings. They compel seamen, (a most gallant, but improvident class of men,) to contribute somewhat in the day of their prosperity towards their own relief, when sickness and casualties overtake and cripple them. Act 1798, c. 94 [1 Story's Laws, 554; 1 Stat. 605, c. 77],—the first of the series,—provides, that the master or owner of every ship or vessel of the United States, arriving from a foreign port into any port of the United States, shall pay to the collector at the rate of twenty cents per month, out of his wages, for every seaman employed on board of the vessel, since she was last entered at any port of the United States. Another section extends the like provision to vessels engaged in the coasting trade. By the same act the president of the United States is authorized, out of the funds so raised, to provide for the temporary relief and maintenance of sick and disabled seamen in the hospitals, or other institutions now established in the ports of the United States; or in ports, where no such institutions exist, in such other manner as he shall direct; provided that the moneys collected in any one district shall be expended within the same. And the surplus is reserved as a fund for the erection of hospitals for the accommodation of sick and disabled seamen. I need not dwell upon the subsequent amendatory acts (Act 1799, c. 142 [3 Bior. & D. Laws 266; 1 Stat. 729, c. 36]; Act 1802, c. 51 [2 Story's Laws, 878; 2 Stat. 192]; Act 1811, c. 93 [2 Story's Laws, 1187; 2 Stat. 651, c. 29]), because they have not changed the objects of the charity. These still remain,

"the relief and maintenance of sick and disabled seamen," without the slightest reference to the time, the place, or the manner, of their sickness or disability, whether in port, or on the ocean; whether in the service of the ship, or otherwise; whether from their own fault, or from inevitable casualty. All seamen are the objects of the bounty, who are sick or disabled. What class of seamen have been practically construed to be seamen within these acts, it is not now necessary to determine. It seems, that at an early period, (1800,) the government issued instructions, by which all officers of the navy and of the marines, and all seamen and marines in the public service of the United States, (the acts respecting hospital money being extended to them,) and "all officers and seamen in the merchant service," were admissible into the hospital establishments, unless the disorder, with which they were visited, was contagious or malignant. These instructions have never been altered. It is certainly questionable, whether all seamen whatsoever, (and whalemen and fishermen are seamen in the sense of the marine law,) are not within the scope of the acts: and if they are, no executive instructions can lawfully narrow them. It seems, indeed, that the acts have been practically construed not to impose upon ships and vessels in the whale and other fisheries the payment of hospital money; and it is most natural, under such circumstances, to presume, that congress intended the benefit for those, who were to bear the burthen. But on this point I give no opinion; because none is necessary in this case. If seamen in the whale fisheries are not entitled to the benefits of the charity, because they do not contribute to the fund, then the argument at the bar, founded upon the supposition, that they may be relieved. falls to the ground. If, on the other hand, they are entitled to the charity, although not contributors to the fund; then it is, because the acts are founded upon a general policy, applicable to all cases of sickness or disability, without reference to their being in the ship's service; and then they steer wide of the objects of the maritime law. They are auxiliary to, and do not supersede it. In truth, the relief may be required, where there are no funds to be administered, and in cases where the instructions prohibit it. It seems to me, therefore, that the argument from this source does not present any sufficient obstacle to the claim.

It has been asked, if, in a claim of this sort, the expenses of cure are to be paid by the ship, what are the limits of the allowance? May they be extended over years or for life? Are they to be, like the pensions allowed by some of the marine ordinances, in cases of wounds and other injuries. received by seamen in defending the ship from the attacks of pirates? My answer to suggestions of this sort is, that the law embodies, in its very formulary, the limits of the liability. The seaman is to be cured at the expense of the ship, of the sickness or injury sustained in the ship's service. It must be sustained by the party, while in the ship's service; and he is not to receive any compensation, or allowance for the effects of the injury. But so far, and so far only, as expenses are incurred in the cure, whether they are of a medical or other nature, for diet, lodging, nursing, or other assistance, they are a charge on, and to be borne by, the ship. The sickness or other injury may occasion a temporary or permanent disability; but that is not a ground for indemnity from the owners. They are liable only for expenses necessarily incurred for the cure; and when the cure is completed, at least so far as the ordinary medical means extend, the owners are freed from all further liability. They are not in any just sense liable for consequential damages. The question, then, in all such cases is, what expenses have been virtually incurred for the cure; not what might, under other circumstances, be incurred. The owner is not to respond for charity actually administered by others, but for expenses. He is not to pay what may remunerate the sufferer for his losses, or what in compassion or humanity he might demand; but what the law has measured out as the limit of justice. Cases, indeed, may occur. where a seaman may be entitled to a far different compensation, as where he has gone beyond the line of his duty, and saved the ship from impending perils. There, he may be entitled to a more ample compensation, in the nature of a salvage, to indemnify him for any wounds or injuries sustained in this extraordinary service. The case, put by Cleirac and others, (see Cleirac, Jugemens d'Oleron, arts. 6, 7, and note by Cleirac; Consolato del Mare, c. 182, c. 137; 2 Pard. Coll. Mar. 152,) of wounds sustained in defending the ship against pirates, may be of this nature. But it then probably falls under the head of a general average, for the benefit of all concerned, or of a salvage service, which entitles the party to a full recompense. That is not the present case; and it may well be left for decision, until it shall arise directly in judgment. And this leads me to remark, that the present is not a case, where the expenses are to be deemed a general average charge upon all, who are concerned in the voyage. It is strictly a charge upon the ship-owners; and comes out of their earnings, or arises from their proprietary interest in the voyage. Although seamen in whaling voyages are compensated by shares of the proceeds, this compensation is always treated as in the nature of wages. They are never deemed partners, although they may be said to partake of the profits of the voyage. And the very nature of the service excludes the notion of partnership. It would defeat the very objects of the parties. The apportionment of the proceeds is only a mode of ascertaining their compensa-

tion; but the shares are treated as separate, distinct, and independent claims. No one ever supposed, that the seamen in whaling voyages were liable to third persons for the debts of the ship, or the outfits of the owners for the voyage. This doctrine has been long established upon the soundest rules of interpretation of the contract. See Wilkinson v. Frasier, 4 Esp. 182; Mair v. Glennie, 4 Maule & S. 240; The Frederick, 5 Rob. Adm. 8; Baxter v. Rodman, 3 Pick. 435, 439; Abb. Shipp. (Ed. 1829) note, p. 432.

The only remaining ground. upon which the claim is resisted is, that the injury was not sustained in the service of the ship, but by the fault of the libellant. And if this be maintained in point of fact, it is certainly a sufficient answer to the claim. The ground is this, that the seamen, although in the ship's service at the time of the accident, were guilty of gross negligence in not returning to the ship at an earlier hour, according to the orders given to them by the mate on giving them leave to quit the boat; and that the accident would have been wholly avoided by a return at an earlier hour. The orders, it is said, were, that they should return in a half-hour; and they did not return until after the lapse of an hour or two. It is not very easy to reconcile the evidence on this point, either as to the nature of the orders, or the time of the return. But some latitude must be allowed, in cases of this nature, in the construction of the orders, whatever may have been the exact terms, in which they were conveyed. They were probably understood to import no more than, that they must return to the ship at an early and reasonable hour. They could scarcely have been intended to tie up the seamen to the exact limit of a half-hour, without any departure from the punctum temporis. There was no pressing emergency leading to the necessity of such a construction of the orders. There was nothing in the then state of the weather, or the admonition of the mate, or the nature of the service, requiring such extraordinary punctuality. If there had been, and it might have been foreseen, that delay would be attended with a great accumulation of dangers, or serious mischiefs to the ship's service, the case might admit of a very different consideration. Suppose the crew had overstayed the time but five minutes, and the accident had occurred, could it be contended, that the owners were exonerated? It would be a most inconvenient and unjustifiable course to tie up the maritime law to such niceties. We must look to the nature of the service, and the general import of the orders, in cases of this sort. The most rigid promptitude may be exacted in some cases; while in others a more indulgent rule may be fairly employed. All that could have been intended in this case is, that the boat should return to a ship in a reasonable time in the course of the evening. I think the weight of the evidence decidedly is, that she did return in a reasonable time, and not at a very late hour. And I am by no means satisfied, that it is clearly made out in proof, that the boat would not have met with the accident, if her departure had been at an earlier hour. Besides, the accident occurred, while the libellant and the others of the boat's crew were actually in the ship's service. There is no pretence to say, that in the management of the boat there was any negligence. The neglect, if any, was in the non-compliance with the strict terms of the orders. They obeyed the orders in returning, but not as promptly as was required. Now, it may be reasonably doubted, if under such circumstances, any thing short of gross negligence could forfeit, on their part, their ordinary rights. We must here, as in many other cases, not extend our inquiries too far back into independent causes. Causa proxima, non remota, spectatur, is the doctrine of the law, founded upon common sense and convenience in the ordinary transactions of human life. The storm here was the immediate cause of the injury, and not, strictly speaking, the fault of the boat's crew. But if such a rule were inapplicable, still, I think. there might be gross negligence, that is, that sort of negligence, which the law denominates crassa negligentia, and which would operate somewhat like a fraud upon the owners. Ordinary negligence, consistent with entire good and a sober intention to comply with duty, and, much less, slight negligence, ought not to be visited with so deep a forfeiture. Repentance and a return to duty, even after a fault, are not in the maritime law visited with such extraordinary severity. It is rather the tendency of that law to wink at slight offenses, and to punish those only which are gross and deeply injurious to the ship's service. It does not appear to me, that, in the present case, there was any gross negligence, or any unreasonable and intentional delay on the part of the boat's crew, in wilful disobedience of orders. The case, therefore, is not made out in point of fact, so as to require the application of a forfeiture of the common claim.

Then, again, it is urged, that the claim comes too late, or so late, that it furnishes a strong reason for rejecting it. Certainly this court is not disposed to entertain old and stale claims. But the delay is here quite consistent with good faith. And, indeed, it is obvious, that it was founded wholly in a mistake of the party's rights. The libellant was ignorant that such a claim was maintainable; and has been prompt enough to bring it forward, since he has been enlightened on the subject. If it had been clear, that this delay had worked any real mischiefs to the respondents, the court would extremely regret it. But if the libellant's ignorance of the law ought not to avail in his favor, the respondents cannot avail themselves of a like ignorance to escape from

their duty. They were bound to know the law, as well as he; and, in a mutual mistake, the law looks to the rights of the parties, and contents itself with measuring out that, without entering upon the more difficult task of adjusting personal equities in foro conscientiæ.

I do not understand, that there is any objection to the amount awarded by the district court, if the principle is right. Being of opinion, that the principle is right, I shall, therefore, affirm the decree. But as the question is new, and the controversy most fairly submitted to the court, I shall direct, that each party pay his own costs in this court.