---

## THE J. F. CARD.

*(District Court, E. D. Michigan. May 26, 1890.)*

ADMIRALTY—SEAMEN—LIABILITY OF SHIP TO SUPPORT AND CURE INJURED.

    The obligation of a vessel navigating the lakes to support and cure seamen taken sick or receiving injuries in the service of the ship does not extend beyond the termination of the seaman's contract, and his return to his home or to a marine hospital.

*(Syllabus by the Court.*

In Admiralty.

This was a libel for wages, and money paid for medical attendance, board, and nursing, after libelant had been compelled to leave the vessel by reason of injuries received while in her service. The facts of the case were substantially as follows: Libelant shipped as mate on the schooner J. F. Card, August 24, 1889, at $60 per month wages. He stated his employment was for the remainder of the season, but admitted that he signed shipping articles for a voyage from Detroit to Toledo, thence to Gladstone, thence to Escanaba to load ore, and thence to Erie, the port of destination. The articles themselves were lost. While the vessel was proceeding down Lake Erie, about 10 o'clock in the evening of September 16th, with a fresh wind and considerable sea, libelant went on top of the cabin to reef the mainsail. The main boom was properly crotched to prevent its swaying, though it necessarily lifted a foot or two in the seaway. Libelant, and the seamen aiding him, had got the reef point tied as far as the forward end of the cabin, when he attempted to jump down upon the deck. He did not take hold of the boom, but turned around to step down, and while doing this the boom struck him on the elbow and hip, and threw him upon the deck. He was carried below at once, where he remained until the vessel arrived at Erie, the second day after the injury, when a physician was summoned to treat him. He told the master on the same day that he would have to leave the vessel, and at his request another mate was hired. As soon as possible, he was taken at his own request to the steamer Nyack, and returned to his home in Detroit. It was conceded that he received his wages at the agreed rate until he left the vessel at Erie. His injury appeared to be an intercapsular fracture or a bruise. He claimed in his libel wages to the end of the season, the expenses of his medical attendance, board and nursing for seven weeks.

*Stewart O. Van der Marck,* for libelant.

*H. H. Swan,* for respondent.

Brown, J. The most important question of fact in this case relates to the contract of hiring. Upon the one hand, libelant swears that he was hired at Detroit on the 23d day of August "until the vessel laid up," or "for the balance of the season," and that the master "understood it so at the time." The wages were to be $60 per month. Upon the other hand, the master swears he hired him for "just as long as we agreed." "I hired him for the trip to go from here to Toledo" at $60 per month. He adds that he usually hires the men for as long as they can agree. About four days after he went on board, and before the vessel started on her voyage, the master instructed the libelant, who was the mate, to procure the signatures of the sailors to shipping articles for the voyage from Detroit to Toledo; thence to Gladstone; thence to Escanaba to load ore; and thence to Erie, the port of destination. These articles were lost, but it was admitted that they would show that libelant's name was signed about the third, instead of being the first, as they naturally would be, he being the mate. Owing to some dispute, either about the rate of wages or the length of the trip, the sailors declined to sign the articles until libelant had signed them; whereupon, in order to induce them to sign the articles, libelant put his own name down the third on the list.

Without undertaking to determine whether the articles were binding upon him when the agreement, as sworn to both by him and by the master, was a different one, it is clear that there is no preponderance of evidence in favor of the libelant that his shipment was for the season. My own impression is from the whole testimony that the agreement was indefinite as to time; that there was a mutual understanding that either party might declare the contract at an end if he chose to do so; but, as both parties are agreed that the rate of wages was to be $60 per month, I think that justice will be done by following the rule laid down by Judge Longyear in the case of The John Martin, 2 Abb. (U. S.) 172, and treating this as an engagement for, at least, one month, with the option on either side of terminating the engagement at the end of the month.

What, then, were the legal obligations of the schooner to the libelant with respect to his injuries? It is too well settled to require a citation of authorities that a seaman taken sick or receiving injuries in the service of the ship is entitled to be treated at the expense of the ship, unless such injuries are received in consequence of his own gross carelessness. This is not only the law of England and America, but apparently of every civilized nation possessing a maritime code. The real question in this case is, how long does this obligation remain in force? Does it continue indefinitely, until the seaman is cured, or does it cease upon the completion of the voyage, or of his contract of hiring? If we are to accept the authority of Reed v. Canfield, 1 Sum. 195, as applicable to this case, we should be obliged to hold that the liability continued until the cure was complete, "at least so far as the ordinary medical means extend." In this case the injuries were received just as the ship Albion was returning from a whaling cruise, and after she had reached New

Bedford, the port of destination, but before the crew had been discharged. The court held that the acts of congress with respect to hospital money and the relief of sick and disabled seamen had not superseded the maritime law, but were rather to be deemed auxiliary to it, and that the obligation to cure the seaman at the expense of the ship extended beyond the termination of the voyage, although he did not undertake to fix a limit to it. This opinion, however, has not been received with the deference usually accorded to the utterances of Mr. Justice STORY. His well-known leaning toward the admiralty courts, and his belief in the beneficence of their jurisdiction and forms of relief, may have had a certain influence in inducing him to extend its aid to cases not properly within its purview. Subsequent cases have tended to limit the doctrine of *Reed* v. *Canfield*, and it is doubtful if it can any longer be accepted as law. In *Nevitt* v. *Clarke*, Olcott, 316, 322, Judge BETTS criticised this case, and held that the privilege of seamen to be cured at the expense of the ship continued no longer than the right to wages under their contract. "It is manifest," says he, "that a construction of this law, which should charge owners of vessels with the support of sick crews without limitation of time, would be most oppressive in its consequences, if it did not also tend to impair to a serious degree the maintenance and prosperity of a merchant marine, and thus become a public evil." The question was also considered by Judge MILLER, of the district court of Wisconsin, in *The Ben Flint*, 1 Biss. 562, in which he held the ancient maritime rule applicable to seamen upon the lakes as well as upon the high seas; but, after a full review of American cases, came to the conclusion "that, in the absence of misconduct or neglect on the part of the officers, the obligation of the vessel to provide for disabled or sick seamen should only be co-extensive in duration to that of the seaman to the vessel." He denied the libelant relief for any expenses incurred after his arrival at the port of discharge. The question was again considered by Judge BETTS in the case of *The Atlantic*, Abb. Adm. 451, 476, and he adhered to the principle "that a seaman has no claim upon a ship or her owner for the cure of his sickness or disabilities after his contract has terminated, and he is returned to his port of shipment or discharge, or has been furnished with means to do so." The question was also considered by Judge BROWN with his usual care in *The City of Alexandria*, 17 Fed. Rep. 390, in which he came to the conclusion that "the maritime law affords no sanction for any claim to compensation beyond that already received by the libelant in due medical care and treatment, and wages to the end of the voyage." Of course, if there be any negligence or misconduct on the part of the officers of the vessel, this would furnish a separate ground for action, in which the seaman would recover, not only his expenses for medical attendance, etc., but compensation for his personal injuries, as in ordinary cases of negligence.

But, whether the case of *Reed* v. *Canfield* be considered as correctly decided or not, it is very evident that it has no application to the short voyages or trips upon the lakes. The rule was originally adopted for

the protection of seamen on long ocean voyages, where they were unable to obtain medical attendance, or, if obtainable, usually had no money to spend for that purpose. Upon such voyages sailors are shipped for many months, and even years, while upon the lakes they are rarely shipped for more than one or two trips, and the whole equipment may be changed a dozen times in the course of the season. To say that the obligation of the ship extends to the cure of every man of these crews who happens to be taken sick or receives an injury while upon the vessel, no matter how long the disability may continue, would be imposing a burden upon vessel owners far beyond that contemplated by the law, or required in the interests of humanity. The court will take judicial notice of the fact that marine hospitals are established at the principal lake ports for the nursing and cure of sailors, which are supported by deductions from their wages. In view of the fact that there is such a hospital here in Detroit, I think that the libelant cannot charge the owners of this vessel with the expenses of his medical attendance and board and nursing for the seven weeks following the accident, and before the filing of his libel. He should have resorted to the marine hospital, where he would have been treated free of expense to himself and to the owners of the ship.

I think that full justice will be done him by permitting him to recover his wages for the balance of the month, the amount paid his physician at Erie, and his return fare to Detroit; and for this amount he is entitled to a decree, with costs.