# HENRY WITTHOF *vs.* THE AMERICAN BARKENTINE FULLERTON.

## October 19, 1907.

*Master and servant—Duty of the master as to the safety of the servant—Liability of master:*  It is the duty of the employer to furnish the employe with a reasonably safe place in which to work, and safe machinery and appliances to work with, and for his failure to do so, whereby the servant is injured, the employer is liable to him in damages.

*Shipping—Difficulty in procuring safe appliances—Assumption of risk by master:*  When the agents of a ship, because of the impossibility of fully equipping her with safe appliances for the use of the crew without serious delay, send her to sea with unsafe and defective appliances, knowing them to be defective, they assume for the ship the risk of all damages that may result from the use of such defective appliances, including damages for injuries to any of the crew who may be injured thereby.

*Seamen—Injuries at sea—Release of master's liability:*  In such a case the ship may be relieved from such liability, First, when, before the beginning of the voyage any of the crew who are afterwards injured in consequence of such defect, become acquainted with such defect and understand its danger to those who may have to use the appliances in which it exists, and have an opportunity of withdrawing from the service of the ship; second, when a member of the crew who knows of such defect and understands its danger voluntarily or carelessly and recklessly exposes himself to the danger and is injured.

*Same—Injury in service—Duty of ship to make most accessible port:*  When a member of the crew of a vessel is so injured at sea that obviously life or limb is in serious danger without prompt surgical assistance, of which a master is presumed to know, and there is a probability of being able to reach another port in less time than to reach the port for which the ship was cleared, and in time for the relief of the injured seaman, it is the duty of the master to proceed to such other port, regardless of considerations of expense to the ship or cargo.

*Same—Same—Same—Insurance:*  Insurance on ship and cargo not invalidated by such departure from the insured voyage.

*Same—Incapacitated by ship's negligence from following the sea—Liability of the ship:*  A chief officer being incapacitated from following his employment by injuries caused by the negligence of his ship, is entitled to such an amount in damages as will provide him an income for the rest of his life, under the accepted rules of expectation of life, which shall approximately make up his loss of income caused by such incapacity.

*In Admiralty:*  Libel *in rem* for damages for personal injuries.

*E. A. Douthitt* and *E. C. Peters,* Proctors for Libelant.
*Smith & Lewis,* Proctors for Libellees.

DOLE, J.   The libelant, the first officer of the American barkentine Fullerton, brings his libel *in rem* against the said Fullerton and claimants, for damages for injuries received by him on a voyage of the said Fullerton from the port of San Francisco, State of California, to the port of Kihei, Territory of Hawaii, she being under tow by steamers during such voyage.   Two grounds of damages are alleged: First, that during such towing operations the towline, the same being a chain cable, started to slip over the windlass of the Fullerton, and while libelant was attempting to prevent such slipping by lashing the line to the towing bitt he was injured by the slipping of the line, which injury was due to the negligence of the owners of the Fullerton in furnishing a windlass which with its appliances was unsafe to those using it.   Second: at the time of such accident the Fullerton was about 500 miles from Port Harford and about 1,500 miles from the port of Kihei, and the master of the Fullerton, in violation of his duty to libelant, proceeded on his voyage instead of returning to Port Harford for medical assistance for libelant, whereby and because of the long time required for reaching said Kihei, libelant's right arm had to be amputated after arriving at Kihei, in order to save his life.   For the said negligence and violation of duty to libelant, whereby he was caused extreme and long-continued suffering and the loss of his arm, and the incapacity resulting therefrom, to perform the duties of his employment as a mariner and ship's officer, he claims damages in the amount of fifty thousand dollars.

The libellees, in their answer, deny the negligence charged, and allege that before the departure of the Fullerton from San Francisco, whence she proceeded to Port Harford for her tow, the libelant had accurate knowledge of the said windlass and its appliances, and its functions and the operation of the same, and of any defect therein, if defect there was, and of the lia-

bilitics arising therefrom in the case of the towing of the Fullerton by means thereof, and therefore assumed all the risks, if any, that might arise therefrom; and further allege that libelant was injured solely through his own carelessness in attempting to lash the towing line in heavy weather, and in a reckless manner, without signalling the towing vessel Lansing first to slow down.

As to the charge of the libel of violation of duty to the libelant, the answer alleges in substance that if the Fullerton had put about and returned to Port Harford she would have been compelled to cast off her towline from the Lansing and proceed under her sails alone; that the winds were uncertain and variable, and the master believed that they would in all probability reach the port of Kihei with the aid of their tow in less time than it would take to reach Port Harford under sail.

The first basis of damages raises two questions of fact and of law: First, was the ship, through its owners and representatives, guilty of negligence in furnishing unsafe appliances with which to manage the ship, thereby rendering it liable for injuries received by reason of such unsafe appliances? Secondly, if that is the case, is the ship relieved from liability because of the assumption of the risk by libelant, or by his negligence in exposing himself to the danger?

The following facts are established: The libelant shipped on the Fullerton December 18th, 1906, at San Francisco, as first officer, for a voyage to Kihei and thence to Port Harford, in the State of California, with pay of $90.00 a month and board and lodging, and had for some time previously been receiving $100.00 a month and board and lodging worth $50.00 a month. He held a license as chief officer for sailing vessels over 700 tons and steam vessels of any tonnage. On December 19th the Fullerton was towed to sea and on to the offing of Port Harford, where she was transferred December 21st to the tow of the steamship Lansing, and proceeded under such tow for said port of Kihei. The towline was made up of a cable from the Lansing, shackled to the port anchor chain of

the Fullerton, paid out to a length of twenty fathoms and lashed to the towing bitt of the Fullerton and then passed over the wildcat of the windlass into the chain locker.  A wildcat, or gipsy as it is sometimes called, is a part of the windlass on some vessels.  It contains open compartments or divisions in its periphery which should correspond with the size of the links of the chain used with it, so that a link will lie in a compartment, the next link connecting with the third link in the next compartment, and so on, whereby the chain is held by the shoulders of every other link fitting into its respective compartment of the wildcat as it revolves, carrying the chain with it, or is held fast when the wildcat is motionless and held by its brake. The links of the chain used with the port wildcat were too long to fit into its compartments, and were therefore in danger of slipping over the wildcat when carrying a strain, in consequence whereof the use of such chain in connection with the said wildcat was dangerous to those attending to it.  Such chain and wildcat were placed on board the Fullerton just previous to the said voyage, with the full knowledge of the master and other agents of the Fullerton of such misfit.  The towing chain was, during the said towing operations, lashed to a towing bitt, an upright timber three to three and one-half feet square, rising out of the deck forward of the windlass.  Such lashing previous to the accident was made with an old rope, by the order of the master, against the remonstrance of the libelant. After dark in the evening of December 24th, with the ship pitching into a choppy sea, the towing chain started to slip over the wildcat, breaking such lashing, and libelant, with the assistance of some of the crew, attempted to lash it more firmly to the said towing bitt to stop and prevent such slipping, and, while so engaged, the chain slipped suddenly over the wildcat and violently struck libelant, throwing him down and pinioning and crushing his right arm against the towing bitt, breaking some of the bones and bruising and tearing the muscles and ligaments.  At the time of this accident the Fullerton was toward 600 miles away from Port Harford and about 1500 miles

from Kihei.  Libelant requested the master to return to Port Harford for medical assistance, but the master decided to continue the voyage to Kihei.  After landing at Kihei libelant's arm was amputated near the shoulder.

As to the first question, counsel for libellees has contended that because a proper chain for use on board the Fullerton, in connection with her wildcat, could not be obtained in San Francisco or Oakland, and could not be obtained from the East for two months, they had done all that prudence and the exigencies of the situation required; in other words, in order to save the Fullerton from loss by delay, the ship was deliberately sent to sea with appliances which were admittedly unsafe for the use of the crew, and her agents were justified in so doing.  The mere statement of the proposition refutes the contention.  If the ship could not make proper preparations for sea, and chose to go to sea without them, it was a deliberate assumption by her of all risks and all damages which might result from such want of preparation, which would include all damages that the crew might suffer in the way of injury through such want of preparation.  The only way out of it would have been to have acquainted the crew before departure with the defect and its danger, and to have given them an opportunity to decline to make the voyage or to make it with their eyes open to the danger, and accepting the risk.

The question of the assumption of risk by the libelant is, perhaps, the most important one in the case, and a great deal of testimony has been placed on record in regard to this.  The defendant endeavored to show that libelant knew, before the ship sailed, that the chain which was procured for the port wildcat did not fit it.  It is shown that libelant, as first officer, had charge on the 18th and 19th of December of the work of getting to sea, including the task of shipping both the starboard and port anchor chains, assisting in shipping a new port wildcat, and other matters; that the starboard chain came aboard early in the afternoon of the 19th; the port chain, which was a shorter one, came late and was shipped after dark; that the

chains were transferred to the chain locker by means of the wildcats,—as I understand it the wildcats were revolved, thereby letting the chains pass over them into the lockers below them. It is contended that from these circumstances libelant must have known that the port chain did not fit the wildcat. .As a matter of fact neither chain fitted either wildcat, and it is asserted that he knew that the starboard chain did not fit the starboard wildcat, and was so put on his inquiry. I do not find this to be proved. Mr. Evers, a consulting engineer who was in the employ of the company managing the Fullerton, delivered the chains on the wharf, and he says that during the afternoon of the 19th libelant admitted to him that the chains did not fit the wildcats, but that they would do. This the libelant denies. He says he was busy here and there attending to various matters, and was not especially in touch with the wildcat, and did not notice that the chains did not fit; the port chain was put on in the dark and he knew nothing about the misfit until the next day when they were out at sea, at which time he noticed it and called the captain's attention to it, and the captain said to him "Tell me something that I don't know." The libelant was not called upon to inspect everything to see that it was safe; it was his right to take it for granted that the owners and their agents had done their duty in this respect. *Hough v. Railway Co.,* 100 U. S. 219; *Smith v. Erie R. R. Co.,* 67 N. J. L. 636, 59 L. R. A. 306; *Chicago R. R. Co. v. Hines,* 132 Ill. 161, 22 Am. St. R. 515; *Louisville & N. R. Co. v. Baker,* 17 S. 452, 453.

The defense put on several of the crew, one of whom said he saw the starboard chain slip over the wildcat while getting it aboard in San Francisco, and noticed that it was too large. The fact that this witness noticed that the chain was too big does not prove that libelant noticed it, or ought to have noticed it. A chain too large for a wildcat might move with it without slipping, where it was merely taken in without any weight attached to it, and it may have moved without any such ·slip, except at the time referred to by this witness. The statement

of libelant that he spoke to the captain the next day, and called his attention to it, is not denied by the captain; the further statement that libelant, when he noticed that the chain did not fit the wildcat, measured the links, is, if true, inconsistent with the theory that he knew all about the misfit character of the chain the day before. The fact of his speaking to the captain, and of his measuring the links after that date, would imply surprise and some anxiety. There is nothing in libelant's testimony that supports the theory that he noticed the misfit of the chain with the wildcat the day the Fullerton sailed, and as to Evers' testimony that he admitted it, we have libelant's testimony denying that statement. On this point the burden of proof is on the libellees. *Hough v. Railway Co.*, supra, 225, 226. I do not find that libelant knew of the mistfit of the chain with the wildcat before going to sea.

Counsel for libellee contends that after libelant discovered the condition of things on the 20th, while out at sea, as he says he did, he still had the opportunity of leaving the employment of the ship, and therefore, by going on with the ship, assumed the risk involved in using the faulty windlass. When libelant was employed by the master on the 18th of December, no shipping articles were signed, and he says that he inquired of the captain about shipping articles and the captain put him off, telling him that he could sign later. Counsel for the libellees takes advantage of this circumstance, in which the libelant was working under an oral agreement, to urge the contention that he might have gone ashore at Port Harford, and that by his not doing so he assumed the risk of using the faulty wildcat and chain during the voyage. The circumstances were these: the Lansing met the Fullerton with her tug from five to eight miles out from Port Harford, and took her in tow. The tug which brought her from San Francisco had her own towline to take up, and started away at speed in order to keep it from her own propeller. It does not appear that there was any very convenient or practicable opportunity for libelant to have taken advantage of the departure of this tug to leave the Ful-

lerton. I do not see how it was possible for him to have done so, except through the cooperation and consent of the master. The libelant appeared to have regarded himself as having shipped for the voyage, probably expecting to sign the articles at some time. In his testimony he states that it did not occur to him that he might go ashore. It evidently appeared to him something like deserting a ship. He said he was the only man besides the captain who understood navigation. At sea conditions of service differ from those on land, where an employe may withdraw from his employment if he finds that it involves a danger that he was ignorant of when he was engaged. A sailor at sea cannot do this; he must serve out the voyage to the next port and obey orders. In performing his duties under such circumstances he cannot be held to have voluntarily assumed dangers which he was ignorant of at the inception of the voyage or that were outside of the ordinary risks of his employment. The fact of a tug's returning to the shore under the circumstances off Port Harford, with the other fact that libelant had not signed shipping articles, does not, in my opinion, take his case out of this rule. Furthermore, if the libelant failed to appreciate the danger attending the use of the winch, the contention falls to the ground, whatever the circumstances.

" It is objected by the learned counsel of respondent that the facts stated show that the service necessarily required, by the employment was dangerous, and that the plaintiff, by entering upon it, took the risks and hazards upon himself, and that he was not bound to obey orders requiring such service, and might have declined the service and abandoned the employment, and was negligent in not so doing."

" We think that the peculiar character of the employment, and the relations existing between the master and the common seaman of a merchant vessel outside of port, remove this case from these objections and the authorities cited to sustain them; and that although they might be correct legal propositions in respect to other kinds of employment, they have scarcely any application here.  *  *  *  *  *Smith v. C. M. & St.*

*Paul R'y. Co.,* 42 Wis. 525; *Wedgwood v. C. & N. W. R'y. Co.,* 44 id. 44, and many other cases in this court." *Thompson v. Hermann,* 32 Am. Rep. 784, 785, 786.

Counsel for the libellees contends also that the ship is relieved of liability for the injury through the negligence of libelant by which he carelessly and recklessly exposed himself to danger and brought the injury upon himself.

General statements of a rule of law are sometimes misleading, by being vague and indefinite. The proper statement of the rule is, that one who knows of the defect and understands the danger created by it, is precluded from recovery when injured in consequence of such defect, when he has voluntarily exposed himself to the danger created by it. *Fitzgerald v. Conn. R. P. Co.,* 155 Mass. 155; *N. W. S. S. Co. v. Griggs,* 146 Fed. Rep. 472, 475; *Anderson v. Clark,* 29 N. E. 589, 590.

"There may be a perception of danger without knowledge of the risks." *Crawford v. Am. S. & W. Co.,* 123 Fed. Rep. 275, 279, 280; *Clark v. Holmes,* 7 H. & N. 937. Libelant had been told by some of the crew of the Fullerton of the loss of the port anchor chain of the Fullerton on the previous voyage, by its slipping over the wildcat, by which the wildcat was carried away and the chain ran out, carrying the starboard chain to which it was shackled, with it. It was this, rather than the danger of injury in the way it actually happened to him, that was in his mind, so far as the evidence goes. He had never before had to do with a wildcat when its chain was too large for it. On the evening of the 24th of December, when he was informed that the chain was slipping over the wildcat, he feared that it might carry things away and not only damage the ship but put her in serious danger; to him it was an emergency calling for prompt action. As to signalling the Lansing to slow down, he says he had no authority to signal, and could not use the signal without the captain's permission, and that valuable time would have been lost in preparing to signal. The negligence of the agents of the ship had brought about this dilemma. "In the presence of great and unforeseen danger

no man is expected to act with deliberation." *Kekauoha v. Robert Lewers,* 1 U. S. Dist. Ct. Haw. 75, 85. "An engineer who remains at his post and faces danger is not to be deemed negligent * * *. If he believes his duty requires him to do what he can to save those under his charge, and he braves death in the discharge of that duty, the law has for him no censure, but has, on the contrary, high commendation and respect." *Penn. Co. v. Roney,* 46 Am. R. 173, 174, 175; *Cottrill v. Chicago,* 37 Wis. 634, 32 Am. R. 796. These cases are not exactly analogous to the case before the court, but they are sufficiently so to support the application of the principle involved in them. There is no convincing evidence that there was negligence on the part of the libelant in the operation of making the lashing referred to. The proximate cause of the accident was the negligence of the ship, and the action of libelant by which he exposed himself to danger was not unreasonable and may be regarded as meritorious. The further point is raised in the argument, that the master was negligent in using the winch and misfitting chain to meet the strain of the tow. The point is well taken. The master, knowing that the chain did not fit the windlass, should have adopted some other method of fastening the towline,—by the towing bitt, for instance, which was apparently made for this very purpose.

The second basis of damage claimed is the refusal of the master of the Fullerton to turn back for Port Harford after the accident, for medical assistance. I find no basis for an argument in the contention of counsel for libelant that the Fullerton and the towing steamer, the Lansing, being engaged in a joint enterprise and connected by a towline should be considered as a single vessel, as in the case of a collision, and that therefore the Lansing was under an obligation to have returned with the Fullerton to Port Harford. Neither the pleadings nor the evidence raise or support such a proposition. The ship was at about one-third of the distance from Port Harford to Kihei. The weight of the evidence is that the winds were favorable for a quick passage back to Port Harford, and were

likely to continue so, but are uncertain and variable at that time of the year. It is also in evidence that there is liable at all times of the year to be thick fogs along the Pacific coast, sometimes extending several hundred miles out to sea. These fogs are most prevalent in the summer and fall, but are sometimes met with in the winter months. There was a fair chance of reaching Port Harford in from three to five days, though it might have taken much longer. It was fairly certain that the continuance of the voyage to Kihei would take ten days at least, and there were chances of stormy weather which might compel the two vessels to separate and finish their respective voyages alone, in which case, with the unfavorable winds which are likely at that time of the year, the completion of the voyage of the Fullerton would be considerably delayed. The cargoes of both vessels were oil, which would not suffer from delay. The injury to libelant was of a most serious nature, requiring immediate surgical attention, and this the master may be presumed to have known. *The Iroquois,* 118 Fed. Rep. 1003, 1005.

It does not appear that the master took the injury to libelant very seriously; on the contrary, he treated it rather nonchalantly. He does not appear to have given the subject much deliberation, although he says he thought the whole matter over and came to the conclusion to continue the voyage. Upon libelant's urgent request to return for fear of serious consequences to his arm if the voyage was continued, the master answered according to libelant's testimony, "that will be all right, you know I can't turn around, it would cost me too much money, see how much it will cost to turn around, and the steamer will not go with me anyway." He made no attempt to procure the assistance of the Lansing in the matter, either to return with the Fullerton or to convey libelant to Port Harford, leaving the Fullerton to finish her voyage alone.

" I cannot agree to the proposition that sacrifice of time and risk to cargo are matters which can properly be permitted to outweigh the duty of procuring surgical aid for a seaman dis-

abled in the service of a vessel, when such assistance is necessary, and cannot be obtained otherwise than by putting into port. The obligation of the ship is discharged only when the master has used reasonable care in providing for the comfort and care of the seaman. Whether he is required to deviate from his course, and touch at some port at which the seaman can receive better attention than can be given him upon the vessel, will depend upon the circumstances of the particular case, such, for instance, as the nature of the seaman's sickness or injury, and the probability of being able to reach a port in time for his relief; but it would seem clear that if one of the crew were so ill or severely injured that any one of ordinary judgment, seeing him, would know that his life or limb was in serious danger, and that he ought to have medical or surgical aid at the earliest possible moment, then it would be the imperative duty of the master to take the necessary steps to procure such aid, if within his power." *The Iroquois,* 113 Fed. Rep. 964, 967.

" The appellee had been disabled while in the service of the ship, and without any fault on his own part. By the maritime law he was entitled to be healed at the expense of the ship. *Reed v. Canfield,* 1 Sumn. 195, Fed. Cas. No. 11,641; *Harden v. Gordon,* 2 Mason 54, Fed. Cas. No. 6,047. This obligation was imposed upon the ship in consideration of the appellee's services, and his undertaking to engage in possibly perilous voyages, and encounter hazards, if necessary, in the protection of the ship and cargo." *The Iroquois,* 118 Fed. Rep. 1003, 1005: 194 U. S. 240.

Insurance on the vessel and cargo is not invalidated by a proper departure from the insured voyage. *The Iroquois,* 118 Fed. Rep. 1003, 1005.

Although the time which would have been required for the return was uncertain, I find from the evidence that the prospects of obtaining speedy medical assistance were decidedly more favorable in case of a return to Port Harford than by a continuance of the voyage to Kihei, and that the seriousness of

the libelant's condition required the adoption of the most promising plan.

I find the ship liable to the libelant in damages for the injuries received by him through the negligence of its agents in furnishing for the ship's use a windlass and chain which did not fit each other, for injuries received through the negligence of the master in using such windlass and chain together for holding the said towline, and for the master's neglect of his duty to the libelant in neglecting and refusing to return to Port Harford for medical and surgical assistance. As to the amount of damages, I consider that the libelant's earning capacity may be reasonably estimated to be not over one-third of what it was before the injury. He is incapacitated from performing work as a seaman, but may still earn something on land. He had been earning in wages and perquisites one hundred and fifty dollars a month, and was earning on the Fullerton in wages and perquisites one hundred and forty dollars a month, with the chance of making it up to one hundred and fifty dollars. He was forty years old on the first of last February, and his expectation of life at the time of his accident was 28.18 years, with a discount for the sea service on a sailing vessel corresponding to five years, which is represented, in the practice of the life insurance companies by a correspondingly higher premium. According to these somewhat arbitrary rules, which, however, appear to be the best we have, the libelant is entitled to an amount which at a reasonable rate of interest compounded annually will furnish him with twelve hundred dollars per annum for the rest of his life, dating from December 24th, 1906, the time of the accident, which is here estimated at 23.18 years. I have taken six per cent as approximating to a conservative and average rate of interest in this country, as the basis of the estimate of this amount, and find the result to be fourteen thousand eight hundred and sixteen dollars and ninety-five cents ($14,816.95). The libelant is also entitled to damages on account of his intense and long-continued sufferings of mind and body brought upon him through

the negligence of the representatives of the ship. I find for the libelant in the sum of seventeen thousand and five hundred dollars ($17,500.00) in the aggregate, and costs.

*Affirmed on appeal*: See *The Fullerton,* 167 Fed. Rep. 1.