## THE TROOP.

### KENNEY et al. v. LOUIE.

(Circuit Court of Appeals, Ninth Circuit. March 7, 1904.)

#### No. 939.

1. SEAMEN—INJURY IN SERVICE—LIABILITY OF SHIP FOR FAILURE TO GIVE PROPER CARE.

Under the general maritime law, as recognized and administered by the admiralty courts of the United States, a seaman may maintain a suit in rem to recover damages caused by the failure of a master to furnish him with proper care, treatment, and supplies after his accidental injury in the service of the ship—the duty being one which rests upon the ship, in respect to which the master represents the owners; and neither the British admiralty decisions, nor the English merchants' shipping act, deny such right, although in matters relating to the navigation of the ship the English decisions treat the master and crew as fellow servants.

2. SAME—JURISDICTION TO ENFORCE LIABILITY—FOREIGN SHIP.

An American court of admiralty may, in its discretion, entertain jurisdiction of a suit by an alien seaman against a foreign ship to recover damages for the gross negligence or misconduct of the master, in failing to furnish libelant proper care, nursing, and medical treatment after his accidental injury while in the service of the ship; and the assumption of such jurisdiction will not be held an abuse of discretion by an appellate court, where the circumstances were such that otherwise the libelant, who was left in this country, permanently injured, and without money, would probably have been without any effective remedy.

3. SAME—GROUNDS OF RECOVERY—DAMAGES.

A decree affirmed which awarded a seaman $4,000 damages against a ship on the ground of the gross negligence of the master in failing to furnish libelant proper care and medical attendance after his accidental injury in the service of the ship, by reason of which he suffered greatly and was permanently crippled.

Ross, Circuit Judge, dissenting.

---

¶ 1. See Seamen, vol. 43, Cent. Dig. §§ 39, 187.

Appeal from the District Court of the United States for the Western Division of the District of Washington.

For opinion below, see 118 Fed. 769.

J. M. Ashton and W. L. Sachse, for appellants.

A. W. Buddress, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. On July 7, 1901, at Philadelphia, the appellee, a subject of the German Empire, shipped on board the British ship Troop as an able-bodied seaman, for the period of three years. On the morning of January 16, 1902, the said ship left the inner port of Fusan, Korea, on a voyage to Puget Sound. At about 2 o'clock in the afternoon of that day the appellee, while at work on one of the upper yardarms of the ship, lost his footing and fell, thereby sustaining severe injuries; his right leg being broken near the thigh, and his left arm being broken between the elbow and the wrist. The weather was calm and the ship was making no headway. Instead of sending the appellee back to the hospital at Fusan, a distance of six or seven miles, the master of the ship, with the assistance of the steward, set the appellee's broken leg and arm, and had him carried to his bunk in the forecastle. There he remained until February 26th, when he was placed on a tug and taken to a hospital at Port Townsend; the ship having arrived at Port Angeles on February 21st. The appellee libeled the ship for damages; alleging that the master negligently failed to take him back to the port of Fusan and to place him in a hospital there, and that he wrongfully and negligently and unskillfully set his fractured leg and arm, and that the master was negligent in not paying further attention to him thereafter, and in not sending him to a hospital on arriving at Port Angeles.

The appellant A. F. Kenney, the master of the ship, made claim for the same, and answered the libel, denying the allegations of negligence, and averring that the ship was a British ship, and that under the laws of Great Britain the master and the appellee were fellow servants; that the neglect, if any there were, to furnish proper medical treatment, was the neglect of the master, a fellow servant, for which neither the ship nor her owners were responsible. The proof offered on the trial to sustain this allegation concerning the British law was sections 92 to 266, inclusive, of the merchants' shipping act of 1894. No testimony was taken of counsel learned in the British admiralty law, and no other proof was offered than a printed volume purporting to contain the act aforesaid. The court entered a decree for the libelant and against the ship for the sum of $4,000.

Concerning the law of the case on the appeal, the appellants principally rely on two propositions: First, that by the decision of the Supreme Court of the United States in the case of The Osceola, 189 U. S. 158, 23 Sup. Ct. 483, 47 L. Ed. 760, a doctrine has been announced which denies the right of a seaman to pursue a vessel in rem for injury occasioned by the neglect of the master to furnish him proper medical treatment when sick or injured in the service of the vessel; and, second, that, whatever may be the established rule upon

that subject in the United States, the admiralty law of England, by which the present case is to be governed, recognizes no such lien. In the case of The Osceola the Supreme Court answered two questions which had been certified to it from the Circuit Court of Appeals for the Seventh Circuit, which, condensed into one, were, in substance, whether a vessel was liable in rem to a member of the crew for injury resulting from the improvident and negligent order of the master, in directing that the gangway be unshipped while the vessel was at sea, running against the wind. The appellants rely on the language of the opinion, where it is said, "The statutes of the United States contain no provision upon the subject of the liability of the ship or her owners for damages occasioned by the negligence of the captain to a member of the crew; but in all but a few of the more recent cases the analogies of the English and Continental codes have been followed, and the recovery limited to the wages and expenses of maintenance and cure"—and upon the final proposition announced in the opinion at page 175, 189 U. S., page 487, 23 Sup. Ct., 47 L. Ed. 760, "that the seaman is not allowed to recover an indemnity for the negligence of the master or any member of the crew, but is entitled to maintenance and cure, whether the injuries were received by negligence or accident." These observations of the court are general in their terms, but it must be remembered that they were directed solely to the questions certified to it for decision. The inquiry concerned the liability of the ship to a member of her crew for injuries received through a negligent order of the master, made while navigating the ship. It is not implied in the language so used, nor is it to be presumed therefrom, that the court intended to establish a rule narrower than that recognized by the more recent decisions of the federal courts, that the master and the crew are fellow servants only as to matters connected with the navigation of the ship, but that the master of a ship at sea represents the owners in respect to the personal duties and obligations which they owe the seamen. Olson v. Oregon Ry. & Nav. Co (D. C.) 96 Fed. 111, affirmed in 104 Fed. 574, 44 C. C. A. 51; City of Norwalk (D. C.) 55 Fed. 98; Gabrielson v. Waydell (C. C.) 67 Fed. 342. Nor is it to be presumed that the learned justice who delivered the opinion of the court intended to discredit the views theretofore expressed by him in The J. F. Card (D. C.) 43 Fed. 92, where, in discussing the obligation of the ship to care for and cure sick and injured seamen, he said, "Of course, if there be any negligence or misconduct on the part of the officers of the vessel, this would furnish a separate ground for action, in which the seaman would recover not only his expenses for medical attendance, etc., but compensation for his personal injuries, as in ordinary cases of negligence;" nor is it, we submit, to be presumed that it was the intention of the court to overrule, without referring thereto, a long line of American decisions in which it has been uniformly held for nearly a century that a seaman injured while in the service of his ship is entitled to proper care and medical attention at the expense of the ship, and that, if this be neglected, the ship may be held in consequential damages. Brown v. Overton, 4 Spr. 462, Fed. Cas. No. 2,024; The Chandos (D. C.) 4 Fed. 645; The City of Alexandria

(D. C.) 17 Fed. 390; The Vigilant (D. C.) 30 Fed. 288; The J. F. Card (D. C.) 43 Fed. 92; Gabrielson v. Waydell (C. C.) 67 Fed. 342; The Fred E. Sander (D. C.) 95 Fed. 829; Whitney v. Olsen, 108 Fed. 292, 47 C. C. A. 331; The Eva B. Hall (D. C.) 114 Fed. 755; The Iroquois, 118 Fed. 1003, 55 C. C. A. 497; The Troy (D. C.) 121 Fed. 901. Not only does the opinion in the Osceola Case express no disapproval of the doctrine of these decisions, but it incidentally cites the two leading cases of Brown v. Overton and The City of Alexandria—the former upon the proposition that a seaman receiving injury in the performance of his duty is entitled to be treated and cured at the expense of the ship. That was a case in which consequential damages were awarded a seaman who was injured on a voyage from Calcutta to Boston, for the failure of the master to take him into the port of St. Helena for medical treatment.

To support the proposition that the law of Great Britain gives no lien upon a vessel for consequential damages in a case such as is here presented, the appellants rely upon the provisions of the merchants' shipping act of 1894. A few only of the sections of that act are pertinent to the present inquiry. Section 156 provides, in substance, that a seaman may not by any agreement forfeit his lien on the ship, or be deprived of any existing remedy for the recovery of his wages. Section 207 provides that the expense of providing necessary surgical and medical advice and attendance, and the expense of maintenance of a member of the ship's crew who is hurt or injured in the service of the ship, "shall be defrayed by the owner of the ship without any deduction on that account from his wages," and that if by the neglect of the master or owner there is failure to equip the ship with proper medicines, medical stores, or accommodations, the owner or master shall be liable to pay all expenses (not exceeding three months' wages) properly and necessarily incurred by reason of the illness, and that such expenses may be recovered as if they were wages duly earned, "but this provision shall not affect any further liability of the master or the owner for the neglect or any other remedies possessed by the seaman or apprentice." Section 208:

"If any of the expenses attendant on the illness, hurt or injury of a seaman or apprentice, which are to be paid under this act by the master or owner, are paid by any British consular officer or other person on behalf of the crown, or if any other expenses in respect of the illness, hurt or injury of any seaman or apprentice whose wages are not accounted for under this act to that officer are so paid, those expenses shall be repaid to the officer or other person by the master of the ship. If the expenses are not so repaid, the amount thereof shall, with costs, be a charge upon the ship, and be recoverable from the master or from the owner of the ship for the time being, as a debt to the crown, either by ordinary process of law or in the same court and manner as wages due to seamen."

It is contended that under these statutory provisions the lien upon the ship in favor of the seaman is limited to his claim for wages, and that, while the owner of the ship is required to furnish medicine and attendance, if he fails so to do the owner, not the ship, must repay to the seaman the amount of expenses actually incurred therein. It is to be noted, however, that the act gives to any British consular officer who pays such expenses a lien on the ship therefor, for it declares

that such expenses shall be a charge upon the ship, to be recovered in the same court and manner as wages due seamen. It is undisputed that, under the English law, wages due a seaman may be recovered by a proceeding in rem in the admiralty court. It is not shown what was the law of Great Britain prior to the enactment of the merchants' shipping act of 1894. If prior to that time the English admiralty courts recognized a lien upon a ship, and the right to proceed against her in rem for the recovery of damages, in a case such as we have here under consideration, we do not find that the act, in terms or by necessary implication, has impaired that right. It has declared, it is true, that the expenses of medical advice and attendance to a hurt or sick sailor shall be defrayed by the owner of the ship, and it provides for the recovery of damages, to a limited extent, for the failure so to do, but this is not necessarily inconsistent with the existence of a right to pursue the vessel in rem; and there follows the proviso that "this provision shall not affect any further liability of the master or owner for the neglect or any other remedies possessed by the seaman or apprentice."

But it is said that, irrespective of the special provisions of the merchants' shipping act of 1894, by the law of England, as interpreted by its courts, the master and the crew of a ship are fellow servants at all times, under all circumstances, and as to all relations; and the appellants cite the decision of Lord Chancellor Herschell in Hedley v. Pinkney, etc., S. S. Co., Ltd., 7 Asp. Mar. Law Cases, 483, in which it was said:

"It was argued that the master of a vessel, although in some respects the servant of the shipowner, possesses in relation to the crew powers and duties independent of him, and that the law which exempts a master from liability to his servant for the negligence of another servant engaged in a common employment with him did not apply in such a case."

And the Lord Chancellor proceeded to add that he did not think it possible to give effect to that contention.

That was a case in which the personal representative of a seaman who had been lost at sea sued the owners for damages; alleging that the master, while navigating the ship at sea, was negligent, in failing to have placed in position, on the approach of stormy weather, a detachable portion of the ship's rail. The court, in denying the right of the administratrix to recover, made use of the language above quoted. What was there said was in answer to the argument that a duty rested upon the master to keep the ship at all times in a seaworthy condition, and that as to that duty he was not a fellow servant with the members of the crew. There was no question in that case, however, but that the vessel was in a seaworthy condition when the voyage began, and that the owners had in that respect fully met their obligation. In holding, as the opinion does, as to the question there presented and the argument so advanced, that the master and the crew were fellow servants, the decision is not inharmonious with the more recent decisions of the American courts; and there is nothing in the language of the court that may not be reconciled with the view that as to all the duties of the ship or its owners to the crew, where sickness or injury has in-

tervened, the master is, in England as in the United States, the representative of the former.

It is urged, also, that in the opinion in the Osceola Case the Supreme Court has placed upon the decision in Hedley v. Pinkney, etc., S. S. Co. a construction which accords with the appellants' contention in the present case. It is true that the court in that case said:

"In the English courts the owner is now held to be liable for injuries received by the unseaworthiness of the vessel, though not by the negligence of the master, who is treated as a fellow servant of the seamen. Responsibility for injuries received through the unseaworthiness of the ship is imposed upon the owner by the merchants' shipping act of 1876, 39 & 40 Vict. c. 80, § 5, wherein, in every contract of service, express or implied, between an owner of a ship and the master or any seaman thereof, there is an obligation implied that all reasonable means shall be used to insure the seaworthiness of the ship before and during the voyage. Hedley v. Pinkney, etc., S. S. Co., 1894 App. Cas 222—an action at common law. Beyond this, however, we find nothing in the English law to indicate that a ship or its owners are liable to an indemnity for injuries received by negligence or otherwise in the service of the ship. None such is given in the Admiralty Court jurisdiction act of 1861, although it seems an action in admiralty will lie against the master in personam for an assault committed upon a passenger or seaman. * * * In England the master and crew are also treated as fellow servants, and hence it would follow that no action would lie by a member of the crew against either the owners or the ship for injuries received through the negligence of the master. Hedley v. Pinkney, etc., S. S. Co."

It is clear, however, that this language of the opinion and the discussion of the British law in reference to the question under consideration were directed to the question which had been certified to the court —the question of the liability of the ship for an injury to a seaman occasioned by the negligent act of the master in navigating the ship. It is not perceived that it had any reference to the entirely different question which is involved in the case at bar—the question of the duty of the ship to a seaman after he has been injured in the performance of his duty.

But it is contended that the doctrine of the liability of the ship to furnish medical attendance to the seaman, as recognized in American decisions, received its origin in article 6 of the laws of Oleron, and that those laws have never been recognized as constituting a part of the admiralty jurisprudence of England, but, on the contrary, have there been repudiated in the case of The Whitton, 8 Asp. Mar. Law Cases, N. S. 110 (affirmed by the House of Lords in 8 Asp. Mar. Law Cases, N. S. 272), where it was said that the original or common-law jurisdiction of the High Court of Admiralty of England must be ascertained "from the continuous practice and judgments of the great judges who have presided in the Admiralty Court, and from judgments of the High Courts at Westminster. * * * Neither the laws of the Rhodians, nor of Oleron, nor of Wisbuy, nor of the Hanse towns, are of themselves any part of the admiralty law of England." The court, to sustain that utterance, proceeded to point out the absurdities of some of the obsolete portions of the laws of Oleron. Conceding, however, that the laws of Oleron, as a whole, are not at the present time any part of the admiralty law of England, by virtue of proclamation, legislative act, or the adjudications of the admiralty courts, it

does not follow that certain of their provisions are not the basis of the English admiralty law as it is at present administered. Said Judge Ware, in 1837, in deciding the case of The William Harris, 1 Ware, 373, Fed. Cas. No. 17,695, "There is not a single principle of maritime law more generally recognized by the usages of all commercial nations than this: That the expenses of the sickness of any of the crew shall be borne by the vessel." In Harden v. Gordon, 2 Mason, 541, Fed. Cas. No. 6,047, decided in 1823, Story, Circuit Justice, speaking of the universal rule that such expenses were made a charge upon the ship, referred its origin to the laws of Oleron, "which have been held in peculiar respect by England, and have been in some measure incorporated into her maritime jurisprudence"; and in Reed v. Canfield, 1 Sumn. 195, Fed. Cas. No. 11,641, the same distinguished jurist quoted from the "excellent treatise" of Lord Tenterden on Shipping, who, he said, lays it down generally "that, by the ancient marine ordinances, if a mariner falls sick during the voyage, or is hurt in the performance of his duty, he is to be cured at the expense of the ship"; and the learned justice proceeded to add, "And he is fully borne out in this statement by the language of the ordinances cited by him on this occasion." See Laws of Oleron, art. 6, etc. In all the American adjudications it is clear that section 6 of the articles of Oleron has been regarded as the origin of the law on that subject as it is administered in our courts. From what source has that provision of those ancient laws been incorporated into our admiralty law, if not through its adoption and recognition in the country from which we have inherited that law? There seems no room to doubt that King Richard I adopted for his kingdom the laws of the Island of Oleron, which was then a part of his dominion. See Benedict's Admiralty, § 51, and authorities there cited.

Question is made of the jurisdiction of the trial court, on the ground that the ship is a foreign vessel, and both the appellants and the appellee are aliens. Conceding that the court had discretion to exercise or decline jurisdiction, we discover nothing in the record to indicate that there was abuse of discretion in that regard. The British vice consuls at Port Townsend and Tacoma disclaimed authority to adjudicate the matters involved in the suit. Bolden v. Jensen (D. C.) 70 Fed. 505; The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152; Panama R. R. Co. v. Napier Shipping Co., 166 U. S. 285, 17 Sup. Ct. 572, 41 L. Ed. 1004. Said the court in The Belgenland, "As the assumption of jurisdiction in such cases depends so largely on the discretion of the court of first instance, it is necessary to inquire how far an appellate court should undertake to review its action." The court then proceeded to affirm the rule that the appellant must show that the trial court has exercised its discretion on wrong principles, or that it has acted so absolutely differently from the view entertained by the appellate court that the latter is justified in saying that discretion has been wrongly exercised. To have relegated the appellee to an English court would almost certainly have been to deny him any remedy. He, a German, was left on American soil, crippled and without means. He has prosecuted his suit in forma pauperis. If he had been able to go to England, he could not know when the

Troop would be there, or that she would ever be there, or that, if she were, any of his witnesses would be on board or within his reach.

Concerning the facts of the case, we are not convinced, upon a careful consideration of the evidence, that error was committed by the District Court. The court found negligence in the failure of the master to send the appellee back to the hospital at Fusan, gross negligence in the treatment of the appellee at sea, and further negligence in the failure to send the appellee immediately to a hospital on arriving at Port Angeles, from all of which negligent acts the appellee has been permanently crippled, and disabled from following his calling as a mariner.

The decree of the District Court will be affirmed.

ROSS, Circuit Judge (dissenting). I agree with the court below that the gross neglect of the master of the ship disclosed by the record presents a shocking instance of "man's inhumanity to man"; but, being of the opinion that by the law of England the ship is not liable in rem for the damages claimed, and that under the decision of the Supreme Court in the case of The Osceola, 189 U. S. 158, 175, 23 Sup. Ct. 483, 47 L. Ed. 760, the seaman is not allowed to recover an indemnity for the negligence of the master or any member of the crew, I feel obliged to dissent from the judgment against the ship, allowing the libelant $4,000 damages for the neglect of the master in his treatment of him.