## PETERSON *v.* THE CHANDOS AND MASTER.

*(District Court, D. Oregon.   November 9, 1880.)*

1. CRANE LINE.—The primary purpose of a crane line is to steady the backstays, and in blustery weather it is very apt to chafe and wear out where it is fastened to the stays; and, therefore, it ought not to be used as a foot-rope without caution, and the aid of the stays.

2. SAME.—The weather being wet and the night dark, and the wind strong, the libellant was ordered to go aloft and cast off the stop on the foretop-gallant halliards, which he did by going up the rigging and out on the crane line to the space between the topmast and top-gallant stay, and there untying the stop with both hands while he sat upon the crane line, without any other hold or security, and, just as the stop was cast off, the line parted near the top-gallant stay, and the libellant was precipitated to the deck and seriously injured.

*Held,* that the injury was caused by the negligence of the libellant in going on the crane line without an opportunity of examining its condition, and without holding to the stays by his arms or legs, or both, while casting off the stop; and that if, by reason of the negligence or misconduct of the mate, the crane line was insufficient, still the libellant could not recover damages for the injury, because even then his own negligence substantially contributed to the result.

**3.** FELLOW SERVANT.—*Semble* that the mate is not the fellow servant of a sailor so as to exempt the master from liability for an injury caused to the latter by the negligence of the former.

**4.** DEVIATION.—A departure from the due course of a voyage to save property merely, is a deviation, and will forfeit the insurance; but a departure to save life is not. But, although the law will, as between the insurer and insured, excuse a departure from motives of humanity, a master is not correspondingly bound to make such departure even to save the life of one of the crew; but the time and risk likely to be consumed and incurred in such departure, as compared with that incident to the direct voyage, are to be considered, and have a controlling influence in the matter.

**5.** SAME.—On June 10th, in latitude 38 south, and longitude 91 west, the ship Chandos was on her way to Portland, Oregon, with a cargo of railway iron, without a surgeon or any surgical appliances on board, when the libellant fell from aloft and broke his thigh bone. *Held,* that if the ship could have made a port—as, for instance, Valparaiso, distant about 1,080 miles—in five or six days, it would have been the duty of the master to have gone there, and obtained surgical aid for the libellant; but if it could not have been done in less than two weeks, he was not bound to make the departure.

**6.** SICK OR INJURED SEAMEN.—The hospital service of the United States is not intended to supersede the marine law, which imposes an obligation on a vessel to take care of a seaman falling sick, or becoming injured in its services, but only auxiliary thereto.

**7.** SAME.—A seaman injured in the service of a vessel, without his fault, is entitled to be taken care of at the expense of the vessel until the end of the voyage, and longer, if necessary to effect a cure, so far as the same can be done by the use of the ordinary medical means; and the fault which will exempt a vessel from such liability is not mere ordinary negligence consistent with good faith, but some positively vicious conduct, such as gross negligence, or wilful disobedience of orders.

**8.** NEGLECT TO SEND SEAMAN TO HOSPITAL.—Damages allowed for neglecting to send libellant to the marine hospital at Portland, at the expense of the ship, for 12 days after her arrival in the Columbia river.

In Admiralty.

*John Woodward* and *Charles Woodward*, for libellant.

*John W. Whalley* and *M. W. Fechheimer*, for respondent and claimants.

DEADY, D. J. In January, 1880, the American ship Chandos sailed from the port of New York for Portland, with a full cargo of railway iron. The libellant, Gustavus Peterson, a

native of Sweden and aged twenty-seven years, shipped for the voyage as an able-bodied seaman.

Near three o'clock of the morning of June 10th, in about latitude 38 south, longitude 90 west, from Greenwich, the weather being dark and rainy, with a good breeze, the libelant was ordered by the second mate to go aloft and cast off the stop on the foretop-gallant halliards. He went up the rigging on the starboard side to the top, and thence out on the crane line, and stood or sat upon it—probably the latter—between the topmast and top-gallant backstays, while, without other hold or support, he untied with both hands the stop, which was about 18 inches or two feet above the line. Just as the libellant finished untying the stop, the line on which he was resting parted at the hitch near the top-gallant stay and precipitated him to the deck. In falling, he appears to have struck first on one foot on the ship's boat, which was stowed bottom up on the booms just abaft of the foremast, and then fell over on the deck, striking his head on the pin-rail as he went down. The distance from the crane line to the bottom of the boat on which libellant struck is about 30 feet, and from there to the deck is about 10 feet more.

The alarm was soon given and the man was immediately carried into the house on deck, used as a forecastle, in an unconscious condition, and bleeding profusely from what appeared to be a severe injury to the head. The master was called and came at once to the forecastle, and had the libellant stripped and examined, placed in a bunk, and dressed his head. The fall caused a fracture of the collar bone, and a severe cut in the head, from which the libellant in due time fully recovered. It also caused a fracture of the *femur* or thigh-bone of the right leg a little below the middle of the same. On the next day after the accident the master had the libellant removed into the carpenter's room, and his leg bandaged with splints and placed in a box then made for that purpose. There seems to have been a difference of opinion on board as to whether the leg was broken or not—the master's testimony being that he did not think that it was broken until July 4th, when the vessel was in latitude about 2 degrees north and

longitude 110 west, at which time he became satisfied that it was broken.

The Chandos arrived in the Columbia river on August 10th, and anchored in Baker's bay, where she remained 10 days, and then proceeded to Portland, where she arrived on August 22d. There the libellant was sent to the marine hospital, where he remained about two months. From the evidence of the hospital physicians the bone has united and the leg will in all probability be strong and sound, but it is about three inches short; the knee is also somewhat stiff, but that will probably pass away.

The libellant brings this suit against the vessel and the master to recover $5,000 damages for the injury suffered by the fall, and the subsequent inattention, alleging that the fall was caused by the neglect of the master in not providing a sufficient crane line, and that the shortening of his leg was caused by neglect and the want of proper treatment after the fracture.

Upon the first point I find against the libellant. From the evidence it plainly appears that the crane line is not primarily a foot-rope, and that it is put upon the stays to keep them steady, and not to walk upon, but that it is often used by seamen more or less as a support or rest in going from the top to the stop and casting it off. It also appears that this line, which is usually on this vessel a fifteen-thread ratline, is very liable to chafe and wear from the swaying of the stays, so that sometimes it only lasts a day or so, and is therefore considered an insecure footing, and one that ought not to be used without other support, or more than ordinary caution.

As an evidence of how soon this line may become chafed and weakened, and therefore of its insecurity as a foot-rope, it may be mentioned that on the evening before the libellant was hurt, as he came down from furling the sail, he sat with all his weight upon this same crane line while he put on this same stop. And yet it broke with him under similar circumstances within eight hours thereafter. When, therefore, the libellant, who appears to be a man above the average weight, went upon this line in the dark, without any precaution against

its breaking, or observation as to its then condition, I think he was guilty of negligence. The libellant assumed the ordinary risks of his employment, and the liability of the crane line to part appears to be one of them.

The negligence of the libellant was the proximate, if not the sole, cause of the injury; and, therefore, he cannot recover for the damage resulting from it. 2 Thompson on Negligence, 1148; *Bowas* v. *Pioneer Tow Line.*

But the libellant also claims that the crane line was insufficient when put up, a few days before, by the express direction of the mate, being only a piece of old rotten manilla gasket; that he went upon the crane line to cast off the stop by the special order of the second mate, and that it was customary on the vessel, in giving an order to cast off this stop, to say: "Go aloft, and get on that crane line and cast off the stop on the top-gallant halliards." But, in my judgment, the evidence fails to establish either of these allegations; and, if it did, the libellant would not thereby be relieved from the obligation to exercise ordinary care and prudence in going on such line, or casting off such stop.

Admitting however, the alleged negligence of the mate, and that the master or owner and the vessel are liable therefor, still, if the negligence of the libellant substantially contributed to produce the injury, he could not recover damage therefor. In this view of the matter it is unnecessary to consider whether the mate was a fellow servant of the libellant, within the general rule which exempts a master from responsibility for injuries to those in his employ resulting from the negligence of a fellow servant employed in the same general business.

In *Halverson* v. *Nison*, 3 Saw. 562, the libellant, while at work upon a triangle, fell to the deck, by reason of the negligence of the mate in rigging the same, and was seriously injured. Mr. Justice Hoffman, upon the strength of the authorities, but with apparent reluctance, held that the owners of the vessel were not responsible for the injury.

But the mate being the immediate agent and representative of the master,—his very right hand, as it were,—acting

within his view and under his personal direction, I think he ought not to be considered the fellow servant of the men in the forecastle within this rule, but rather the *locum tenens* of the master and owner, for whose negligence, resulting in injury to any of the crew while in the correct discharge of their duty, the vessel and master ought to be responsible.

The relation between the master and sailor at sea is more of a parental character than that between the employer and employe on shore,—particularly in the great transportation lines, workshops, and factories of modern times; and, therefore, the former may and do rely more for their safety and well-being upon the foresight and personal direction of those in authority over them than the latter. Again, an employe on shore, who is unwilling to incur the risk arising from the negligence or want of skill of a fellow servant, may ordinarily quit such employment, but a seaman must remain on board, at least until a port is made, however unskilful or negligent the mate may be.

In the argument for the respondent and claimants significance was sought to be given to the fact the libellant went aloft in his oil skins and gum boots, and by way of the rigging, instead of "shinning up the backstays." But in this instance it is too plain for argument that the libellant's fall was not in any way attributable to the amount of clothing he wore, or the way in which he went aloft, but solely to the means he adopted of supporting himself while there — the resting his whole weight upon the crane line without being aware of its condition. From the evidence, and the very nature of the case, I am satisfied that it was just as proper, and much easier and safer, to have climbed up the rigging and have swung out on the backstays, to cast off this stop, as to have shinned up the stays for that purpose. Under ordinary circumstances an active, light man might adopt the latter way, while a heavy, logy one, particularly at night in rough weather, would very naturally prefer the former.

The second point made by the libellant is not so easily disposed of. It is the well-settled law that a seaman receiving an injury, or becoming sick in the service of the ship

without his fault, is entitled to be cured or cared for at the expense of the vessel. *Harden* v. *Gorden*, 2 Mass. 547; *Reed* v. *Canfield*, 1 Sum. 197; *The Ben Flint*, 1 Abb. U. S. R. 128; *Brown* v. *Overton*, Sprag. Dec. 462. And the fault which will forfeit this right upon the part of the seaman must be some positively vicious conduct, such as gross negligence or wilful disobedience of orders. Ordinary negligence, consistent with good faith and an honest intention to do his duty, is not sufficient. *Reed* v. *Canfield, supra*, 206; *The Ben Flint, supra*, 130. The propriety and good policy of this rule is eloquently vindicated by Mr. Justice Story in *Harden* v. *Gorden, supra*, 547, and in the application of it a court of admiralty will not be quick to find cause to exclude the seaman from its benefits.

The libellant, notwithstanding his want of caution in going upon the crane line, was clearly entitled to be cared for at the expense of the ship, and the question now is, what was the nature and extent of this obligation? It is not contended by counsel for the libellant that the ship ought to have been furnished with a surgeon, or that the master should have had more than ordinary knowledge and experience in ascertaining or treating fractures of the leg. But it is claimed that if the master had exercised ordinary skill and care in the examination and treatment of the libellant's leg, he would have ascertained that the thigh-bone was fractured, and have been able to set it so that it would not now be three inches short; and also that it was the duty of the master under the circumstances to have gone into the nearest port—Valparaiso—where it is admitted that proper surgical aid and appliances could have been obtained. Upon the evidence it is very uncertain what time it would have taken to reach Valparaiso from the place where the accident occurred—a distance of 18 degrees east and 5 degrees north. Counsel for the libellant argues that it might have been done in 11 days, but the calculation upon which this conclusion is based assumes that the vessel might have changed her course from about north-west to east, and made about four miles an hour to Valparaiso.

Now, there is no evidence in the case as to the force or direction of the wind between the locality of the accident and

the latter place, and we are, therefore, left almost to conjecture as to the time that would have been consumed in making the detour. The burden of proof is upon the libellant to support his allegation that the master failed to do his duty towards him in this respect. If it had been shown that the vessel could, under the circumstances, make about ten miles an hour, and thereby have made Valparaiso in a little more than five or six days, it might have been proper for the master to have gone in there—indeed, I think it would have been his duty to do so. But, as it is, I do not think it would be safe to assume that this port could have been made in less than two weeks, and I do not think that the vessel was under obligation to make that sacrifice of time and risk of cargo for the libellant.

In *Brown* v. *Overton, supra,* the libellant fell from aloft and broke both his legs below the knees. The master set them as well as he could, and they were permanently deformed and disabled. The accident happened 25 days' sail from St. Helena, and the course of the vessel was within eight or ten hours of that port, but the master refused to touch there for surgical aid. Mr. Justice Sprague held that it was the duty of the master to have gone in, although it is doubtful whether the deformity could have been prevented or cured at that late day. No other case at all in point has been cited on this question; and, while it proves it is the duty of the master to seek surgical aid for a wounded seaman while there is any chance of its being useful, yet it by no means follows that it is his duty to do so at any sacrifice or risk to the vessel or voyage. There must be some limit to the obligation to seek aid outside of the vessel. A fall from aloft is an incident of a seafaring life, and the law can scarcely be that in such a case surgical aid must be sought to the serious hindrance or delay of the voyage and the liability of the cargo to depreciation in the port of destination, or the delay or loss to some important enterprise undertaken upon the faith of its due delivery.

It is also urged by counsel for the respondent that, under the circumstances, any departure from the prescribed course of the voyage to obtain aid for the libellant would have been

a deviation, and caused a forfeiture of the insurance upon the vessel and cargo. The rule of law is that a delay by departure from the due course of a voyage, to save property merely, is a deviation, but to save life is not. *Crocker* v. *Jackson,* Sprague's Dec. 142; *The Boston & Cargo,* 1 Sum. 335; *The Ewbank & Cargo,* Id. 424; *Bond* v. *The Cora,* 2 Wash. 84.

Whether a departure in such a case as this can be considered as made to save life may be a question. As between the insured and insurer, if there is any doubt about it, it should be resolved in favor of the former. I have found no case exactly in point, and in the meantime will say, with Mr. Justice Washington, in *Bond* v. *The Cora, supra,* that "I will not be the first judge to exclude such a case from the exceptions to the rule," that a deviation works a forfeiture of the insurance. But the law, in the interest of humanity, will, as between the insurer and insured, justify a departure from the course of the voyage to save life in cases where the vessel is under no legal obligation to do so; and, therefore, even if the Chandos might have gone to Valparaiso to save the life or limb of the libellant without forfeiting her insurance, it does not follow that the master was bound to make such departure. For the like reasons and stronger, which excused the master from going into Valparaiso, he was not bound to put into any port south of San Francisco; and when he reached the point—39 degrees 30 minutes north latitude, 140 degrees 20 minutes west longitude—from which it was convenient to make the latter port, he was quite as near the mouth of the Columbia as the Golden Gate, and was therefore justifiable in preferring the former, as it was on the course of his voyage.

As to the treatment of the libellant on board the Chandos, it does not appear that there is any just ground of complaint, unless it be that the master ought to have ascertained that his leg was broken before he did, and at once. His own testimony is to the effect that he did not conclude the leg was broken until July 4th, and that is the entry in his log. But of the truth of this I am in doubt, because it appears that he treated the limb as if it was broken, as far as the appliances

within his command would permit.   He had the leg bandaged
with splints, and put in a box the next day after the accident.
His present explanation of why he used the box is that it was
to keep the leg from "slatting" (rolling) around with the
motion of the ship; and that very circumstance, it seems to
me, ought to have led to an examination that would have
disclosed the fact that the *femur* was fractured. ' Still, it does
not appear that the master, with the means at his command,
could have cared for the leg any better than he did, even if he
had been certain that it was fractured.   From the evidence
it appears that the fracture was caused by the fall from the
crane line to the boat and striking on the foot, and therefore
it was probably oblique, and attended with more or less dis-
placement—the upper part of the bone turning upwards, and
the lower part pushing downwards and backwards and by the
other.   2 Holmes' Sys. Surg. 861.

In such a case, it appears from the books that if the sub-
ject is an adult, whose muscles are not paralyzed, and there-
fore offer the ordinary resistance to extension, more or less
shortening—from one-fourth to one and one-half inches—
will always be the result, even where the case is treated by
skilful surgeons, with the best appliances; nor will a short-
ening in such case of even three inches necessarily imply
unskilful treatment.   Hamilton's Prin. & Prac. Surg. 291;
Id. Frac. & Dislo. 397; 2 Holmes' Surg. 865; 1 Elwell's Med.
Sur. 97.

It only remains to consider the case after the arrival of the
Chandos in the Columbia river.   And, first, it is well to state
that the obligation of the ship to take care of the libellant,
and do what could be done for him under the circumstances,
continued until the vessel arrived at Portland—the end of his
voyage—and even longer, if the libellant still required nurs-
ing or medical treatment; and the fact that the libellant was
entitled to admission into the marine hospital at Portland,
did not excuse the ship from this obligation, because that was
his personal privilege or right, which he might avail himself
of or not, as he saw proper.   As was said by Mr. Justice
Strong, in *Reed* v. *Canfield, supra*, 200, 202, the hospital serv-

ice in the ports of the United States does not supersede the marine law on this subject, but is only auxiliary to it; and, notwithstanding this, the seaman is entitled "to be cured, at the expense of the ship, of the sickness or injury sustained in the ship's service.   *   *   *   The expenses incurred in the cure, whether they are of a medical or other nature, for diet, lodging, nursing, or other assistance, are a charge on and to be borne by the ship;   *   *   *   and when the cure is completed, at least so far as the ordinary medical means extend, the owners are freed from any further liability."

When the Chandos arrived at Baker's bay, according to the testimony of the experts, there was still a chance that the leg might be reset so as not to be more than one and a half inches short.   At least, the libellant was still on his back from the effects of the injury, with a leg which was manifestly three inches short.   Under the circumstances it was the bounden duty of the master to have procured surgical aid and advice at once, and see if anything could be done to give the unfortunate man the use of his limb.   This aid could have been obtained from Fort Canby, which was almost within hail, or Astoria, only a few miles distant, or by sending the libellant to Portland.

But the master left the vessel at once, and after reporting the case to the collector at Astoria, who it seems advised that the libellant be kept on board until the vessel reached Portland, washed his hands of the matter and proceeded to the latter place on business, without even making arrangements for a surgeon to visit the libellant on board the vessel.   Upon his return to the vessel on August 14th, four days afterwards, he informed the libellant what the collector said, and added that the libellant was now in the hands of the collector, and that he, the master, had nothing to say, but advised him to remain where he was, as it would cost him $40 to go to Portland, besides the risk of moving from boat to boat.

When the vessel came to Astoria, on August 20th, the master, instead of calling a surgeon then to see the libellant, at the expense of the vessel, wrangled with the collector about

employing one until the latter sent a physician on board, who simply advised that as the vessel was going directly to Portland, where there was a marine hospital, that the examination of his case be deferred until he reached there. In all this conduct of the master there appears to have been a manifest neglect of duty, and purpose to shirk the expense of giving the libellant the attention he was entitled to. The libellant was not in the hands of the collector, unless he had actually been delivered into his charge as the agent of the marine hospital service, of which there is no pretence; nor was the expense of transporting the libellant to the hospital at Portland, in advance of the vessel, a proper charge against him under any circumstances, but it should have been paid by the vessel, unless the transportation was furnished by the hospital service.

In this matter I fear the master was actuated by a desire to save expense to the vessel, of which it appears from the answer he is a part owner. In a spirit of petty parsimony he appears to have denied the libellant a chance to have his fractured leg reset and made comparatively useful, rather than incur the trifling expense of sending him from Baker's bay to the hospital at Portland. For this dereliction of duty the master and the vessel are responsible to the libellant in damages. The amount of these, of course, must be limited by the uncertainty as to whether an immediate removal to the hospital would have been of any substantial benefit to the libellant.

In *Brown* v. *Overton, supra,* which is, in many of its circumstances, a similar case to this, the master neglected to send the libellant, who had fallen from aloft and broken both his legs 70 days before, to a hospital for three or four days after the vessel arrived at the port of Boston, and damages were allowed for such neglect, as well as the refusal to put into St. Helena for surgical aid 25 days after the accident occurred, amounting to $600. In fixing the amount of damages in this case the court will not overlook the fact that the general treatment of the libellant by the master has been kind

and considerate, nor that the principal and only fault in his conduct seems to have arisen from a desire to save for the ship at the expense of the libellant. Under the circumstances I think the libellant ought to recover at least $250, and a decree will be given against the ship and master accordingly.