WARREN v. UNITED STATES et al.
No. 45, Docket 21410.

United States Court of Appeals
Second Circuit.

Argued Dec. 9, 1949.

Decided Dec. 27, 1949.

Rehearing Denied March 2, 1950.

Kirlin, Campbell, Hickox & Keating, New York City, Walter X. Connor and Vernon Sims Jones, New York City, Advocates, for appellant John F. X. McGohey, United States Attorney.

Irving H. Raypol, U. S. Atty., for the U. S.

Saul Sperling, New York City, Lester Lyons, New York City, Advocate, for appellee.

Before L. HAND, Chief Judge, and SWAN and FRANK, Circuit Judges.

SWAN, Circuit Judge.

The libellant, a messman employed on a merchant vessel of the United States, sustained injuries during shore leave. The decree on appeal awarded him maintenance in the sum of $644.16 against the appellant, American South African Line, Inc., which managed certain phases of the ship's business under the war-time standard form of General Agency Agreement. Subsequent to entry of the decree, it was authoritatively determined that such an agent is not liable for maintenance. Fink v. Shepard S.S. Co., 337 U.S. 810, 815, 69 S.Ct. 1330. Accordingly the parties have agreed that the decree against American South African Line, Inc., shall be reversed without costs.

The libel against the United States was dismissed for improper venue. The libellant was not a resident of the Southern District of New York and when the libel was filed the vessel on which he had been employed was not within that district.[1] Section 2 of the Suits in Admiralty Act, 46 U.S.C.A. § 742, prescribes the venue for suits of this character.[2] Hoiness v. United States, 335 U.S. 297, 69 S.Ct. 70. Plainly venue was lacking when the libel was filed, and the answer of the United States pleaded this as a defense.[3] At the trial, however, it was stipulated that the vessel was within the Southern District of New York during the pendency of the action.[4] The libellant contends that

1. The libel alleged that the S. S. Anna Howard Shaw "is now, or during the pendency of this action will be in the Port of New York and within the territory and jurisdiction of the United States of America."

2. Section 2 provides in part as follows: " * * * Such suits shall be brought in the district court of the United States for the district in which the parties so suing, or any of them, reside or have their principal place of business in the United States, or in which the vessel or cargo charged with liability is found."

3. The answer also pleaded to the merits but this did not waive the objection to venue. Untersinger v. United States, 2 Cir., 172 F.2d 298; Orr v. United States, 2 Cir., 174 F. 577.

4. The libel was filed March 2, 1945. The trial was in October 1947. The vessel docked at New York on June 4, 1945 and again on February 3, 1946.

this cured any defect of venue. We think he is right.

■ If a libel *in rem* is filed against a privately owned vessel not in the district, the vessel may be arrested when she comes within the district and the suit may thereafter proceed. See F. E. Grauwiller Transp. Co. v. Exner Sand & Gravel Corp., 2 Cir., 162 F.2d 90, 92; Pacific Coast S.S. Co. v. Bancroft-Whitney Co., 9 Cir., 94 F. 180, 185, reversed on other grounds, Queen of the Pacific, 180 U.S. 59, 21 S.Ct. 278, 45 L.Ed. 419. The Suits in Admiralty Act substitutes for seizure of the vessel the filing of a libel containing an election to proceed *in rem* and the service of copies of the libel on the United States Attorney and the Attorney General. Since a government-owned vessel cannot be arrested, the most that could be demanded of a libellant who had filed his libel *in rem* during the vessel's absence, would be some symbolic equivalent of an arrest when she later came into the district. We can think of nothing he could do as such a symbolic equivalent except to serve again a copy of his libel; and that would be a pure formality having no useful purpose provided the original service gave notice that the suit was *in rem,* as it did in the case at bar.[5] In Carroll v. United States, 2 Cir., 133 F.2d 690, 692, we suggested that it might be sufficient to sustain jurisdiction *in rem* that the ship was within the United States at the time of the trial "since the filing of a second libel would be a mere matter of form." That suggestion was again alluded to in Schnell v. United States, 2 Cir., 166 F.2d 479, 482, and in Grant v. U. S. War Shipping Administration, D.C.Pa. 65 F.Supp. 507, 510. We now accept the suggestion and hold that the defect in venue which existed when the libel was filed was cured when the vessel came within the Southern District of New York. Whether for purposes of laches the suit should be deemed to have been begun when the libel was filed or only when the vessel

came within the jurisdiction of the court is a question not now presented nor considered.[6]

■ On the merits the libellant is entitled to maintenance under the doctrine of Aguilar v. Standard Oil Co., 318 U.S. 724, page 731, 63 S.Ct. 930, 934, 87 L.Ed. 1107, unless his injuries resulted from "some wilful misbehavior or deliberate act of indiscretion" of his own. In the decisions there cited the phrase "gross negligence" is used to describe conduct which will preclude recovery of maintenance.[7] In the case at bar the libellant stood on the brink of a precipitous cliff and leaned forward over the edge in order to get a better view of the rocks and waves thirty-five feet below. His right hand grasped a rod half an inch in diameter which he assumed from a casual glance to be fastened to the building in which he had been dancing and drinking wine. The rod came loose and he was precipitated over the edge of the cliff. The district judge found that he was not so under the influence of alcohol as to be barred from recovery of maintenance; and that he did not act in reckless disregard of his own safety nor was he grossly negligent.

■ We accept the finding that libellant was not drunk. Whether he was "grossly negligent" poses a question which is always difficult to answer. See Moisan v. Loftus, 2 Cir., 1949, 178 F.2d 148. Before the Supreme Court's decision in the Aguilar case, supra, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107, it was not necessary to assess a libellant's degree of care when his injury occurred during a period of relaxation afloat or ashore, for he was barred from recovery on the theory that he was not then in the service of his ship. See Meyer v. Dollar S.S. Lines, 9 Cir., 49 F.2d 1002. And when his conduct was examined, the degree of his fault was sometimes assimilated, on a rather ambiguous theory of proximate cause, to the issue of whether he was in

5. Cf. Schnell v. United States, 2 Cir., 166 F.2d 479, 482, where the libel, a copy of which was served, was in personam.

6. See note 4, supra.

7. Peterson v. The Chandos, D.C.Or., 4 F.

645, 651; The J. F. Card, D.C.Mich., 43 F. 92, 93; The Ben Flint, D.C.Wis., 3 Fed.Cas. page 183, No.1,299. See also Jackson v. Pittsburgh S. S. Co., 6 Cir., 131 F.2d 668, 670.

his ship's service. See Jackson v. Pittsburgh S.S. Co., 6 Cir., 131 F.2d 668. Accordingly, the pre-Aguilar cases are of little assistance in guiding us to a correct decision here.

Since Aguilar, a number of decisions have been awarded maintenance and cure to seamen engaged in their own pursuits ashore under circumstances which did not compel assessment of what degree of negligence should be ascribed to their conduct.[8] The question was squarely presented, however, in Ellis v. American Hawaiian S.S. Co., 9 Cir., 165 F.2d 999. There, the libellant had gone ashore to a Service Club, where he had "a few beers." He then proceeded to dive into a swimming pool containing only four feet of water. Two dives were successful; on the third he struck his head against the pool's bottom. In holding his conduct not so negligent as to bar recovery of maintenance and cure, the court stressed that the danger was not great; on the contrary, Ellis had dived twice without harm before meeting with his accident.

In the case at bar, the risk of serious injury or even death if the seaman should fall over the cliff, was obvious; and the requisite degree of care correspondingly higher. In the face of evident danger, the care which Warren took was very slight— a mere casual glance at the rod which he thought to be a "lightning arrester or something of that type." We think that a man who acts as he did under circumstances of danger does not show even a minimal degree of regard for the consequences of his act. Unless his ship is to

be an insurer of his safety, he cannot recover against her.

Dismissal of the libel against the United States is affirmed on the merits; the decree against the ship's agent is reversed without costs.

On Petition for Rehearing

SWAN, Circuit Judge.

By petition for rehearing the libellant has presented the contention that our decision disregards the provisions of the Shipowners' Liability Convention of 1936, proclaimed by the President to be effective as to the United States and its citizens as of October 29, 1939, 54 Stat. 1693-1704. Article 2 of the Convention is printed in the margin.[1] The libellant argues that while Clause 1 is self-executing, the exceptions permitted by Clause 2 do not become operative without express Congressional action putting them into effect. This was the opinion expressed by Chief Justice Stone in concurring in the result in Waterman Steamship Corp. v. Jones, reported in Aguilar v. Standard Oil Co., 318 U.S. 724, at page 738, 63 S.Ct. 930, 87 L.Ed. 1107. Further support for the view that the Convention is self-executing may perhaps be found in language used without discussion of the problem in O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 42, 63 S. Ct. 488, 87 L.Ed. 596 and Farrell v. United States, 336 U.S. 511, 517, 69 S.Ct. 707.

If it be assumed that Clause 1 of Article 2 is self-executing, there would seem to be equal reason to make the same

---

8. Kyriakos v. Goulandris, 2 Cir., 151 F.2d 132; Nowery v. Smith, D.C.Pa., 69 F. Supp. 755, affirmed 3 Cir., 161 F.2d 732; Smith v. United States, 4 Cir., 167 F.2d 550; Grovell v. Stockard S. S. Co., D.C. Pa., 78 F.Supp. 931.

1. "Article 2.

"1. The shipowner shall be liable in respect of—

"(a) sickness and injury occurring between the date specified in the articles of agreement for reporting for duty and the termination of the engagement;

"(b) death resulting from such sickness or injury.

"2. Provided that national laws or

regulations may make exceptions in respect of:

"(a) injury incurred otherwise than in the service of the ship;

"(b) injury or sickness due to the wilful act, default or misbehavior of the sick, injured or deceased person;

"(c) sickness or infirmity intentionally concealed when the engagement is entered into.

"3. National laws or regulations may provide that the shipowner shall not be liable in respect of sickness, or death directly attributable to sickness, if at the time of the engagement the person employed refused to be medically examined."

assumption as to Clause 2, unless the phrase "national laws or regulations" must be interpreted to exclude decisional law and refer only to legislation. It is true that Chief Justice Stone in the Aguilar case, supra, after stating that the first clause of Article 2 is self-executing went on to say "and that the exceptions permitted by Clause 2 are not operative in the absence of Congressional legislation giving them effect." [318 U.S. 724, 63 S.Ct. 938] This bald statement of opinion does not disclose any reasons in support of it, and despite the high regard we have for any utterance of Chief Justice Stone, independent examination of the question constrains us respectfully to disagree. When the Convention was proclaimed to be effective, the existing maritime law of the United States recognized not only the shipowner's duty to pay maintenance and cure but also exceptions to that duty in case the seaman's injury or sickness was due to his own "wilful act, default or misbehavior" or in case he "intentionally concealed" sickness or infirmity existing when he signed the ship's articles. These are the same exceptions in respect of which Clauses 2(b) and 2(c) of Article 2 declare that "national laws or regulations may make exceptions." While it is conceivable that Article 2 contemplated that Clause 1, which is declaratory of the existing duty to pay maintenance and cure, should be self-executing but that the exceptions presented by Clause 2 should not be operative unless and until carried into effect by Congressional legislation, it seems to us most improbable that such a result was intended. It would mean that part of the existing decisional law was to continue and part was to be repealed, no matter how long the repealed part had been the settled policy of the state; and that to re-establish that policy the state must take affirmative legislative action. In the meantime, the repeal would benefit only seamen who are least deserving of protection, since their sickness or injury resulted from their own default or was intentionally concealed from their employer. We cannot believe this was intended. Furthermore, it may be noted that Clause 3 of Article 4 provides that if there is "in force" in the territory in which the vessel is registered, "a scheme applying to seamen of compulsory sickness insurance," etc., such "scheme" will modify the general rule of liability declared by paragraph 1 of Article 4. In other words, it does not require legislation to make effective exceptions to the general rule if a "scheme" is already "in force." It is true that the language of Clause 3 of Article 4 —"national laws or regulations may provide"—is not precisely the same as in Clause 2 of Article 2, "national laws or regulations may make exceptions in respect of". But in substance we think it is the same. Article 12 also indicates that not all existing decisional law is to be repealed. Our study of the Convention leads us to the conclusion that if Clause 1 of Article 2 is self-executing so also is Clause 2. If, on the other hand, Clause 1 of Article 2 is not self-executing the Convention does not apply. Either construction of Clause 1 leads to the conclusion that our decision is not affected by the terms of the Convention.

As his final argument the libellant urges that even if Clause 2 is to be deemed self-executing, gross negligence is not within the exception of injury due to the "wilful act, default or misbehavior" of the seaman. These words are used to describe conduct which will preclude recovery of maintenance, and that is precisely the meaning of "gross negligence" as stated in our original opinion.

The petition for rehearing is denied.

FRANK, Circuit Judge (dissenting).

O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 42, 63 S.Ct. 488, 87 L.Ed. 596, and Farrell v. United States, 336 U.S. 511, 517, 69 S.Ct. 707, seem to me to leave no doubt that the Supreme Court has held provisions of the Convention, similar to Clause 1 of Article 2, to be self-executing. The only question, then, is whether Clause 2 of Article 2—i. e., "that national laws or regulations may make exceptions" —is to be interpreted as if it read "existing national laws, regulations or decisional rulings, shall constitute exceptions." Chief Justice Stone, in his concurring opinion in Waterman S. S. Co. v. Jones, reported in Aguilar v. Standard Oil Co., 318 U.S. 724,

738, 63 S.Ct. 930, 938, 87 L.Ed. 1107, said that he was of "opinion that Article 2, Clause 1 of the treaty authorizing the recovery is self-executing, and that the exceptions permitted by Clause 2 are not operative in the absence of Congressional legislation giving them effect. (See letter of Secretary of State to the President, dated June 12, 1939, quoted in H. R. Rep. No. 1328, 76th Cong., 1st Sess., pp. 5-7.)"

This interpretation seems to me to be in accord with both the literal and reasonable meanings of the words, and is supported by the cited interpretation given by the Secretary of State. The construction given by my colleagues seems to me to be unnecessarily complicated and insufficiently sustained by persuasive reasons to justify a disregard of Chief Justice Stone's views. My colleagues' use of Clause 3 of Article 4 as an aid in construing Clause 2 of Article 2 is weak, I think, for two reasons: (a) Clause 3 of Article 4 contemplates an existing "scheme" created by statute, not a mere decisional product; and (b) it makes no reference to "exceptions," as does Clause 2 of Article 2.