### LAGE v. UNITED STATES.

United States District Court
S. D. New York.
May 19, 1950.

Paul C. Matthews, New York City, John J. Robinson, New York City, for libellant.

Irving H. Saypol, United States Attorney, New York City, Corydon B. Dunham, New York City, Xavier N. Sardaro, New York City, of counsel, for respondent.

McGOHEY, District Judge.

The libellant with five years' experience as an able-bodied seaman, was employed as such from April 11 until May 30, 1945, in the crew of the John A. Dix which was then owned and operated by and for the account of the United States of America. On the last day of his service the ship was discharging grain at Marseilles, France. Some time after 10 P.M. on that day, libellant returned to the ship after seven hours' leave ashore. He claims to have slipped on a collection of grain and grease at the head of the "brough" gangway, as a result of which he sustained a fracture of his right wrist. He reported to the second officer, Mr. French, who made the following log entry at 10:20 P.M.: "At 10:20 p. m. May 30, 1945, AB Jack Lage reported aboard with a sprained wrist. Given first aid treatment. Said injury caused by falling on ship's gangway. Appeared to have been drinking. Gangway inspected and found properly rigged and adequately lighted and clean. J. C. F." It will be noted that the entry says nothing about grease on the gangway, and there is no reason to suppose that the second officer would have deliberately concealed this if it had been reported to him.

The following day he was sent and admitted to 80th Station Army Hospital and paid off to May 30. The hospital records show the radius of the wrist was fractured —not sprained. He was discharged from the hospital on June 18, 1945, when he boarded the S. S. Emily Dickinson for repatriation, and arrived at Norfolk, Va., on July 5, 1945. On July 13, 1945, after being examined at the U. S. Marine Hospital in New York, he shipped as an A.B. seaman on the S. S. Hawaiian Shipper. His last service at sea terminated on January 22, 1946, and he is now employed ashore by John G. Lage, Inc., a foreign exchange and steamship agency.

Libellant claims no permanent disability, but seeks an award for the injury; for pain and suffering of nine months' duration; maintenance and cure amounting to $36; and $343 for war bonus and unpaid wages up to July 13, 1945.

Libellant was his own sole witness as to what happened. Respondent called libellant's shipmate, who testified they were together on the night in question, as well as the Master of the ship. The second mate's deposition was put in, and an expert, who was uncontradicted, testified to the safety of the gangway as described. From all this, the following appears.

Lage, by his own account, left the ship at 3:00 P.M. and proceeded to town where he visited the Continental Hotel, "had something to eat and a few beers." Thereafter he "walked around Marseilles for quite a few hours", apparently sight-seeing, and then to "another place", named either

the White or Pink Elephant, where he had a "few more beers", after which he went back to the hotel where he "hung around for a while and then went back to the ship about ten or eleven o'clock." He first said he "got two rides back" and later changed his testimony to say it was only one ride in "a command car." He recognized a shipmate in the court room, but denied drinking with him on the night of the accident although he said he possibly did so prior to that night.

The shipmate, Butrica, testified that he and libellant were union delegates for the deck and engine room respectively, and that he knew and frequently talked to Lage. His testimony was clear and frank and substantially corroborated. He impressed me as truthful. Butrica says he met Lage about 8:30 the night of the accident in "The Broadway Cafe", which sold only wine; Lage was drinking wine; Butrica joined him in this pastime and they had about five or six drinks each, up until about ten o'clock, when they started for the ship. They missed the bus but joined a group of "eight or ten fellows" who "crowded into the command car"; after traveling some distance they came upon a "Navy flat top truck" carrying two sailors. Butrica and Lage left the command car, got on the truck, where they lay on their stomachs and held on by "getting a hold" on the underside of the floor of the truck. Lage got up "to better his position" when the truck suddenly stopped; but before he completed the shift of position it started up again and he was thrown to the roadway, from which he was helped back to the truck by Butrica and the two sailors. Butrica says he and Lage stumbled and fell several times walking from the gate to the ship and that the wine "had taken a pretty good hold" on both of them. Butrica "gave Lage a hand part of the way" and preceded him up the gangway which he says had neither grain nor grease on it, and the lines were "not too tight or not too loose" and he "had no trouble." He did not see Lage fall on the gangway.

The Master and second officer say the gangway was clean of grease or grain.

The Master, Captain Burt, was a very impressive witness. He says that in order to check the ship's draft he went ashore and returned several times over the gangway, and found it properly rigged in all respects, and free of grain. Indeed, he said that the small suction tubes through which the grain was being unloaded were the best he'd seen and spilled practically no grain at all. He also testified that his officers were very good and kept the decks and gangway swept and clean. The only testimony to the contrary is libellant's, which I am unable to accept. It was uniformly quite hazy except as to the things that would fix the ship's liability. From all the evidence, it is clear to me that the gangway was safely rigged, clean and sufficiently lighted; that libellant was well under the influence of liquor and that he fell from the truck and while walking from the gate to the ship before reaching the gangway. It is by no means clear that he fell on the gangway at all, but if he did it was not because of the presence there of grain or grease. Thus, the injury was in no way attributable to the respondent, but was due to libellant's condition caused by drink, his gross negligence in riding on the floor of an open truck and acting as he did while on it. The claim for indemnity and for pain and suffering will therefore be dismissed, and the claim for maintenance and cure as well. Warren v. United States, 2 Cir., 179 F.2d 919.

Under such circumstances the claim for wages (including bonus payments which constitute a component of the total wage) must also fail. Counsel have cited cases dealing with an injured seaman's right to wages, but they are distinguishable because they do not involve situations in which the injury was due to the seaman's fault. Counsel have cited no cases on that point and my own research has discovered none. It seems to me, however, that the reasoning in Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107, and Warren v. United States, supra, requires a holding that where a seaman's conduct is so grossly negligent as to bar him from the traditional right to maintenance and cure, and brings about a valid discharge

from his employment, he can not claim compensation for services he was prevented from rendering because of his own misconduct.

Submit findings in accordance with this opinion.