### GILL v. UNITED STATES et al.

No. 221, Docket 21635.

United States Court of Appeals
Second Circuit.

Argued May 5, 1950.

Decided July 27, 1950.

L. Hand, Circuit Judge, dissented.

David M. Fink & Jacquin Frank, New York City (Jacquin Frank, H. B. Gerringer, New York City, on the brief), for libelant-appellee.

Irving H. Saypol, U. S. Atty., New York City (Kirlin Campbell Hickox & Keating, New York City, of counsel, Raymond Parmer, Vernon Sims Jones, New York City, advocates) for respondents-appellants.

Galli & Locker, New York City (Frederick J. Locker, Patrick J. McCann, Patrick E. Gibbons, all of New York City, of counsel), for respondent-impleaded-appellee.

Before L. HAND, Chief Judge, and CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

This litigation resulted from the death of libelant's intestate, Martin Gill, a stevedore, occurring as the result of a fall on November 12, 1945 into the hold of the steamship Cornelia, a vessel owned by the United States and operated by the War Shipping Administration, and at that time anchored at a pier in Jersey City, N. J. Libelant, Gill's widow, brought suit on May 9, 1945 as administratrix to recover damages on behalf of his heirs and next of kin, alleging that the death was caused by respondent's negligence and by the unseaworthiness of the vessel. The United States answered on August 19, 1946, generally denying libelant's allegations of negligence and unseaworthiness, and asserting as affirmative defenses assumption of risk, contributory negligence, incorrect venue, and failure to comply with provisions of Public Law 17, 78 Cong., 1st Sess., 57 Stat. 45, 50 U.S.C.A.Appendix, § 1291. On September 12, 1947, the United States filed a petition impleading, under the 56th Rule in Admiralty, 28 U.S.C.A., Turner & Blanchard, Inc., Gill's employer, which answered on November 13, 1947. After trial, on the merits, the libelant was awarded damages in the sum of $27,000 against respondents; and the petition against Turner & Blanchard, Inc., was dismissed. Respondents assign as error (1) the denial of its motion to dismiss for improper venue; (2) the finding of the court below that the accident was caused by a defective winch on the Cornelia; (3) the conclusion that Gill's death was caused by negligence; (4) the court's failure to find that Gill was contributorily negligent; and (5) the court's failure to find that Gill's death was caused by the negligence of Turner & Blanchard, Inc., his employer.

We turn first to the question of venue. The Suits in Admiralty Act, 46 U.S.C.A. § 742, which is applicable and which permits suits against the United States or one of its corporations, provides in pertinent part that "Such suits shall be brought in the district court of the United States for the district

in which the parties so suing, or any of them, reside or have their principal place of business in the United States, or in which the vessel or cargo charged with liability is found." Libelant is, and at the time she brought suit was, a resident of New Jersey. Consequently, the Southern District of New York was not the proper district for suit unless the Cornelia was "found" in it, within the meaning of the statute. While at the time suit was brought, the Cornelia was not in the Southern District of New York but was in the District of New Jersey, she did enter the former upon three occasions before trial. The suit is *in personam*.

 These facts raise questions which are not without difficulty. Of these, foremost, perhaps, is whether, since this action is *in personam*,[1] it is of any significance that the vessel came within the Southern District of New York after the libel was filed. We think it is and that it had the same effect *qua venue* which similar circumstances were held to have in an action *in rem* in Warren v. United States, 2 Cir., 179 F.2d 919. We there definitely gave effect to the thought expressed in Carroll v. United States, 2 Cir., 133 F.2d 690, 692–93, that, since the vessel had been within the jurisdiction since the libel was filed and a refiling of the libel during the ship's presence would have been sufficient, such re-filing could be dispensed with as merely a matter of form. In Schnell v. United States, 2 Cir., 166 F.2d 479, there was no *in personam* liability, Fink v. Shepard S. S. Co., 337 U.S. 810, 69 S.Ct. 1330, 93 L.Ed. 1709, and the libel, originally *in personam*, when amended at the trial to include an election to proceed *in rem*, was not so served as to give

the United States the required notice to bring it within the *in rem* jurisdiction of the court. Consequently, the result later reached in Warren v. United States did not follow. Here there is *in personam* liability, assuming that the cause of action alleged was proved, and just as the ship could symbolically have been arrested in Warren v. United States, supra, whenever it came within the jurisdiction, so here it could have been symbolically attached, since it could have been attached had it been owned privately. Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 2 Cir., 31 F.2d 265; McGahern v. Koppers, 3 Cir., 108 F.2d 652. We think this follows from the provisions of the Suits in Admiralty Act, supra, 46 U.S.C.A. § 741 et seq. giving a remedy equivalent to that a suitor would have had the vessel been privately owned and at the same time protecting the government's ship from attachment. We now hold that the presence of the vessel within the jurisdiction during the pendency of the libel cured any original defect as to venue. Accordingly, we do not find it necessary to decide whether, as the trial court held, the failure to press the point as to the alleged improper venue before beginning the trial on the merits taken together with the filing of the petition impleading the stevedoring company and the other circumstances here shown add up to a waiver of the defense based upon defective venue. We do wish to point out, however, the desirability of having such questions brought on for determination promptly and preferably in suitable pretrial proceedings. By so doing effective and proper use may be made of 28 U.S.C.A. § 1406(a).

1. A suit for damages for wrongful death, when, as here, the death does not occur on the high seas and hence the suit is not governed by 46 U.S.C.A. § 761 et seq., is dependent upon the applicable state law. Western Fuel Co. v. Garcia, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210; United States v. Lauro, 330 U.S. 446, 459–60, 67 S.Ct. 847, 91 L.Ed. 1011. Public Vessels Act, 46 U.S.C.A. § 781 et seq. If state law does not create a maritime lien as a result of the death, then necessarily, the suit is *in personam*. Western Fuel Co. v. Garcia, supra. If, however,

the applicable state law does create such a lien, the suit may be *in rem*. Vancouver S. S. Co. v. Rice, 288 U.S. 445, 53 S.Ct. 420, 77 L.Ed. 885. We assume, as the parties assume, that New Jersey law does not create such a lien. In addition we assume that the Caledonia was a "merchant", and not a "public" vessel, although the respondent's answer denied this and there seems to be no evidence on the subject in the record: the court so found, and that finding is not challenged.

On the merits the parties are not in dispute as to the following facts. The Cornelia was a vessel some 30 years old, and its winches were of a similar age. On the date of the accident, it was moored with its starboard side against the pier at Pier 9, Jersey City, New Jersey. Turner & Blanchard, Inc., was the stevedore engaged to load the vessel. Her chief engineer, Austin, knew on Sunday, the day before the accident, that the vessel was going to be loaded the following day. On Sunday, he walked around and looked at the winches, looking for loose nuts and bolts, stepping on the brakes, and putting the friction handle down to see about its height, but he did not turn on the steam and test the winches by actual operation.

On Monday morning at 8:00 A. M., the Turner & Blanchard stevedores came on board and were distributed in gangs to the various holds. The general foreman in charge was a man named Hekker. The gang assigned to No. 3 hatch included some twenty-six men, five of whom were in the deck crew. These five were Gill, the hatch foreman; Minardo, the gangwayman or signalman; Brown, the port winch operator or up and down winchman; Baldwin, the starboard winch operator or Burton man; and Christensen, the relief man.

On the starboard side of the No. 3 hatch, which was a refrigeration hatch and hence covered by heavy hatch covers from the 'tween deck as well as the ordinary hatch cover and strong backs, was a catwalk. This catwalk, which had to be removed in order to permit ready access to the hatch for loading was about fifteen feet long, two and one-half feet wide, weighed about fifteen hundred pounds and was nine or ten feet above the deck. It had two inch pipe hand-rails fastened at either end to angle irons; and it was bolted at the corners to the amidship housing and the boat deck, between which it ran. To remove the catwalk, by lifting it up with the aid of a winch and swinging it to the pier where it would be out of the way, Gill and Christensen were to go onto it and place around it a wire sling, the eye of which would be engaged by an ordinary cargo hook raised by the up and down winch, operated by Brown.

However, a wrench to unbolt the catwalk was not immediately available and Hekker, to save time, ordered that the hatch be stripped while the gang was finding a wrench. This was done and the hatch was thus made completely open. The deckman then proceeded to remove the nuts and bolts by which the catwalk was fastened and Gill and Christensen went onto the catwalk and made ready the wire sling. Minardo, the gangwayman, who was standing on the deck at about the middle of the starboard side of the hatch, then gave Brown a signal to start the winch. Brown did so and Minardo guided the hook until it got up just out of his reach and then he signaled for Brown to stop the winch when the hook was within reach of the men on the catwalk. Brown then shut off the steam and put on the brake, actions which should have stopped the further upward movement of the hook at once. What then happened is in dispute except that it is agreed that either the cargo hook or the shackle, by which the hook was attached to the wire fall of the winch—respondents insist it was the shackle—caught on one of the handrails of the catwalk, lifting it up and swinging it over the open hatch. The catwalk and the men on it were thrown into the hold and the men were killed.

Libelant's contention, sustained by the trial court, is that the accident was caused by the defective condition of the winch. It was a single-action Ledgerwood friction winch, not now in general use. It operated to lift loads by means of steam coming from the vessel's main boilers through pipes and a pressure reduction valve to a steam chest. In lowering loads, however, it operated by gravity. In order to raise a load, the winchman would first open the main steam valve permitting steam to enter the winch from the main deck supply. He would then by means of a hand lever open the valve permitting steam to enter the steam chest. This would cause the driving cylinder, having wooden blocks on its perimeter, to revolve. Integral with the drum, to which the fall was attached, was another cylinder of a size to fit over the driving cylinder. To engage these, and thus cause the power to be transferred from the driv-

ing mechanism to the running mechanism, it was necessary to move the cylinder integral with the drum horizontally so as to make it fit over the driving cylinder. The friction between the inner surface of the cylinder integral with the drum and the wooden blocks on the outer surface of the driving cylinder would cause the former and hence the drum to revolve and thus the fall to be raised. All of this may be likened to the perhaps generally better understood action of an automobile clutch. The drum cylinder was moved horizontally by a hand operated friction lever, corresponding to a "clutch pedal." The winch also had a foot brake. The brake drum consisted of a steel band on the inside of which were wooden blocks, held off the cylinder integral with the drum by means of a spring. When the brake was pressed, the steel band would contract, pressing the wooden blocks against the outer surface of the cylinder, and thus would prevent the drum mechanism from revolving. It can be seen, then, that to help stop a rising fall, three things could be done: shut off the steam from the steam chest by means of the hand lever and hence the driving mechanism; disengage the drum cylinder by means of the friction lever; and apply the brake. To slow down a descending fall or to hold a load stationary either or both of two things could be done: apply the brake; engage the drum cylinder.

Respondents concede that single action friction winches occasionally "stick," that is, that the driving cylinder and the drum cylinder will not disengage when the friction lever is moved to the position of disengagement. One remedy for this is to strike the cylinders with a heavy object. One preventive seems to be to pour kerosene on them. The effect of sticking when a fall is being raised is to make it necessary either to use the brake or turn off the steam, or to do both, to prevent it from rising further. The result of sticking when a fall is to be lowered is to prevent its being lowered.

Libelant's version of what happened is substantially that of Brown, the winch operator. Brown testified that, after he raised the cargo hook to a point above Minardo's reach and there stopped it, he told Minardo that because of the latter's position he could not see him without turning his head. Brown asked Minardo to "go up forward" and Minardo did so. Minardo then told him to go ahead with the winch. Brown was looking at Minardo and not at the men on the catwalk, and Minardo gave him the signal to stop. Brown shut off the steam, applied the footbrake and "eased up" the friction lever. He saw the drum continue to turn and pressed heavier and heavier on the footbrake. The drum moved a turn and a half after he tried to stop the winch and he looked again at Minardo, only to see the catwalk swinging towards him. Brown also testified, and in this he was corroborated by Minardo, one of respondents' witnesses, that before the accident, in moving the strongback from the hatch, the winch stuck as he was lowering away and then suddenly released, dropping the strongback on the deck. There was also evidence that after the accident, the up and down winch was being operated by one, Driscoll, in place of Brown, in conjunction with the Burton winch, to bring what is called an "airplane" from the dock, in order to lift the men out of the hold. In this operation, to get the Burton fall to the airplane it was necessary for the up and down winchman to give slack, but the winch stuck and it had to be hit with a heavy object before it would release. A short time later, in removing Christensen's body from the vessel to the dock, it was again necessary for the up and down winch to give slack, but again it stuck, and one of the men had to hit the winch with a hatch cover.

Respondents attacked Brown's testimony in several ways. Minardo testified that he did not give Brown any signal to raise the hook after it had been stopped at a point just beyond his reach; that instead of moving to the forward end of the hatch, he moved to the after end in order to guide the catwalk away from the Burton winch; that he did not see the accident when it occurred. Hekker testified that he came on the scene just as Minardo was guiding the hook up to the men on the catwalk; that after it was stopped it moved ahead again without any signal from Minardo; and that one of the shackles caught on the railing of

the catwalk. Respondent also introduced on cross examination of Brown a signed statement he made to the police three days after the accident in which he made no reference to the winch's failing to stop when he tried to stop it. Brown also had testified that when the winch did not stop he "hollered" and respondent suggests that he would not have done so inasmuch as concededly he was expecting that the signal to stop would be given only when the hook was above the catwalk railing and hence out of danger. All of these matters went to Brown's credibility, however, a matter which is for the trial court. Minardo had in his statement to the police said that "the up and down winch got told to go ahead." Libelant testified that Hekker had told her, after the accident, that he was not present when it occurred. Brown said he was excited when interviewed by the police and only read the top lines of the statement and signed it; it is also to be noted that in his statement he said that he received a signal to go ahead. His calling out when the winch failed to stop would seem perfectly natural in view of the fact that he didn't know where the hook was in relation to the catwalk when he was signalled to stop. All things considered, the trial judge's belief in Brown's credibility does not seem an unreasonable one.

But, respondents argue, two facts make Brown's story physically impossible. The first of these is that there was a ladder running fore and aft from the deck to the deck house at the forward end of No. 3 hatch. This ladder, respondents say, left only two places at which, accepting Brown's testimony that Minardo went forward after the hook stopped out of his reach, Minardo could have stood: one was under the catwalk, on the port side of the ladder, where Minardo could not see Brown. However, it was not necessary for Minardo to see the men on the catwalk; all he had to do was watch the hook and see that it reached the height at which the men on the catwalk could grasp it and put it through the eye of the sling. The second fact is based upon the testimony of one, Taft, who qualified as an expert on winches. Taft's testimony was to the effect that even if the winch was

stuck the drum could not have moved a turn and a half after the steam was shut off. He had made measurements of a winch like the up and down winch on the Cornelia, with reference to the volume of steam which could remain in the space between the shut off valve and the pistons. He concluded that the further movement of the drum could not exceed 5". But this assumes that the reducing valve, reducing the steam pressure from the boilers to the steam line into the steam chest of the winch, is in perfect adjustment, and there is nothing in the record to show that this assumption could be made with respect to Brown's winch. Taft's testimony assumes also that the steam is wholly shut off when the valve is closed by the operator, and that may not have been the case here, though all there is is the testimony of Brown that he did "shut off" the steam. Assuming it was not, and that the clutch was stuck, the accident clearly could have happened by the "creeping" which caused the hook or its shackle to upset the catwalk. To be sure, had the hook actually engaged a part of the catwalk which had held, the men might not have been killed but that hardly makes it impossible for the catwalk to have been upset by the hook rather than the shackle and, after all, nothing turns upon which it was. The burden, we think, was on the respondents to prove that the winch's creeping sufficiently to upset the catwalk was a physical impossibility. See 9 Wigmore on Evidence (3 ed.) §§ 2486, 2509. This burden, we believe, it failed to meet.

We think, then, that the trial court's finding that the winch was defective in that it stuck and caused or contributed to the accident was not clearly erroneous. That respondent was negligent was not found as a fact, but as a conclusion of law, is of no significance, for negligence is a mixed question of law and fact and a finding as to it may properly be labeled either a "finding of fact" or a "conclusion of law." The important thing is that there was sufficient evidence to support the finding of negligence, however it was labeled: respondent's engineer failed to inspect the winch by actual operation, though he was aware of the tendency of such friction winches to stick.

upon occasion; kerosene, to limber up the winches, was not supplied by the vessel to the longshoremen, and there was evidence that longshoremen do not ask for it and have nothing whatever to do with the maintenance of winches. It thus is unnecessary to determine whether unseaworthiness is a "wrongful act, neglect or default" within the New Jersey Death Statute, N.J.S.A. 2:47-1 et seq.; negligence of course is. Cf. The Cleveco, 6 Cir., 154 F.2d 605.

Respondents' argument that Gill was contributorily negligent, and consequently recovery by libelant is barred, Blaker's Executrix v. Receivers of New Jersey Midland Ry. Co., 30 N.J.Eq. 240, is without merit. Whether or not the contention is correct that it was negligent to remove the hatch covers and the fastenings from the catwalk before the winch was hooked to the sling, it was Hekker and not Gill who ordered that done.

■ The dismissal of the cross libel against Turner and Blanchard, Inc., which paid libelant under the provisions of the Longshoremen's and Harbor Workers' Compensation Act, was without error. 33 U.S.C.A. § 905; American Mutual Liability Ins. Co. v. Matthews, 2 Cir., 182 F.2d 322. We find no reason to justify any increase in the amount of damages awarded by the experienced judge who tried this case. Cf. Lauro v. United States, 2 Cir., 162 F.2d 32.

Affirmed.

## On Motion to Remand.

The appellants have moved to remand to permit them to introduce evidence to show that a witness, who was called by the appellee and who testified as an expert on the type of winch Brown was operating when the accident occurred, had falsely testified as to his qualifications in stating that he had attended the United States Naval Academy from 1901 to 1905; had thereafter performed the duties of a naval officer for thirty-two years and had retired in 1937 with the permanent rank of Commander; was assistant to the Marine Superintendent of the United States Lines; and was a licensed master of ocean going vessels. Both he and an expert witness called by the appellants testified, among other things, that on such a winch the drum would continue to revolve some, when there was no load on the hook, due to the pressure of the residual steam, after the steam was shut off provided the "clutch" stuck and the brake failed to hold. As the trial judge said in commenting upon the testimony of these two witnesses, "The experts differed as to the degree of distance of movement." The gist of the testimony of the appellee's expert was that continued lifting movement might have been as much as Brown had testified it actually had been while that of appellants' expert limited it to about five inches. The affidavit of an attorney filed in support of the motion states that the alleged falsity of the expert's testimony as to his qualifications was discovered after the appeal in this case was taken and the record had been printed and at the time when the witness testified in another case as to similar qualifications and then admitted that such testimony was "fictitious."

■ This motion being in the nature of one for a new trial based upon newly discovered evidence, it is essential at least that the evidence sought to be introduced is such that it would probably change the result. Kithcart v. Metropolitan Life Ins. Co., 8 Cir., 119 F.2d 297, certiorari denied 315 U.S. 808, 62 S.Ct. 793, 86 L.Ed. 1207.

■ The evidence attacked was not the only evidence of the qualifications of the witness to testify as an expert on such winches and ordinarily newly discovered evidence which goes only to the credibility of a witness is not a sufficient basis for granting a motion for a new trial. F. W. Woolworth Co. v. Seckinger, 5 Cir., 125 F.2d 97; Brown v. Schwartz, 5 Cir., 164 F.2d 151.

In order to make it appear that the trial judge erroneously gave effect to Brown's testimony the burden was upon the appellants to show that it was physically impossible for the winch to creep as much as Brown said he saw it do. That depended upon the credibility of the appellants' expert and the weight to be given his calculations. Whether they were conclusive, we have said in our opinion on the merits, depended upon whether the basis upon which

they rested adequately and correctly reflected the actual conditions at the time. As we held, there was no proof that it did so. Even if the testimony of the appellee's expert as to the possibility of "creeping" was disregarded, Brown's would remain credible and sufficient to support the findings.

Motion denied.

L. HAND, Chief Judge, dissenting in separate opinion.

CLARK, Circuit Judge, concurring in separate opinion.

CLARK, Cricuit Judge (concurring).

On the question of venue I should prefer to place our affirmance on the ground that the district court's finding of respondents' waiver of the defense had adequate support in the record. Respondents' court activities clearly suggest the inference that they were retaining this defense as an ace-in-the-hole, to be used if others should fail; this was permissible for a time, but was carried too far when the jury trial opened and the libelant herself was completely examined by all parties and adjournment had for the day and week without any complaint from respondents. The attempt then to reopen the matter when trial was resumed after the week-end recess seems to me one of those afterthoughts which a trial judge as experienced as this knew how to dispose of properly. I do not specifically disagree with the ground taken in the opinion; it is at least a logical development from the earlier cases cited. But it does leave the venue privilege as the most barren of chance technicalities, a far cry from the original view of a right to trial in the vicinage, a privilege to be regularly lost in fact as soon as the vessel has any slight business in New York Harbor. Far preferable would be outright repeal of its few remaining vestiges. In all other respects I join in Judge Chase's very complete opinion.

L. HAND, Chief Judge (dissenting).

If the decision were mine, I should remand the case and instruct the district judge to reconsider his findings in the light of the evidence since discovered which greatly impairs the testimony of the libellant's expert witness, Archer. We do not know how far he relied upon Archer to contradict Taft; or whether, if Taft's testimony stood alone, he would have found that the hook or shackle rose enough to engage the rail of the catwalk; or at least that the libellant had borne the burden of so proving. I disagree with my brothers in thinking that the burden was "on the respondent to prove that the winch's creeping sufficiently to upset the catwalk was a physical impossibility." That seems to me to divide the burden of proof, assigning it to one party as to one part of the issue, and to the other as to another part. The libellant had the general burden of proving that the "Cornelia" was negligent, or that the winch was unseaworthy; and if Taft's testimony justified doubts whether the winch could have "crept" enough to upset the catwalk, it should be considered along with the rest of the evidence, in deciding whether the libellant had proved her case. That issue should not, I think, be divided.

We give, and should give, great deference to the findings of the district court; I should be the last one to suggest that we give too much. For example, in this very case on the cold record I doubt if I should not have voted to dismiss the libel, so strong does the respondent's case appear to me. However, I should be unwilling to vote to reverse the finding of unseaworthiness, strong as are my doubts, on the record as it stands. I agree with my brothers that the libellant's case, vulnerable though it is, is not so vulnerable as to be beyond repair by what the record does not preserve; I mean what the judge saw and heard. But it is for that very reason that we should make sure that he has before him any evidence which may change his finding; and I cannot go along with what seems to me a too easy assumption that this evidence would not have changed his conclusion. Perhaps it would, perhaps it would not; how can we know?

Although I should not, on the record as it is, hold the finding of the winch's "unseaworthiness" to be "clearly erroneous,"

I cannot agree as to the finding of negligence, for which there seems to me no adequate support. It is true that the respondent's engineer did not test the winch before it was used, but I suggest that that is too high a standard of care to impose; and, besides, we have no reason to assume that testing it would have disclosed the defect; it had lifted the strongbacks earlier that day without showing any defect. Nor do I think that there is ground for saying that it was not the practise for the longshoremen to ask for kerosene. True, one longshoreman did testify that he had never known any longshoreman to put kerosene on a winch; and that testimony to some extent does contradict the respondent's testimony that it was the practice for longshoremen to ask for kerosene when they needed it, although that particular witness may never have chanced to encounter a bad clutch. That aside, it did not appear in the case at bar how long the interval had been since kerosene had been put on this clutch, or whether that was ever done unless the clutch had developed some defect. So I think that the libellant must rest her recovery on unseaworthiness alone; and, if so, a question arises that was not argued before us or in the district court, which is this: Is a vessel owner liable for a seaman's—or a longshoreman's—death within the territorial waters of a state, when it is caused by the unseaworthiness of the vessel? I have no doubt that the death was owing to the respondent's "wrongful act, neglect or default," as the New Jersey Act uses those words; but in Lindgren v. United States, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686, the Supreme Court held that the Jones Act, 46 U.S.C.A. § 688, superseded a state statute creating such a claim, and even reserved the question whether the Death on the High Seas Act* might not also be superseded. Since then, the Court has indeed decided that a seaman may recover for injuries suffered from the ship's unseaworthiness, Mahnich v. Southern S. S. Co., 321 U.S. 96, 100, 64 S.Ct. 455, 88 L.Ed. 561, and the same is true of longshoremen, Seas Shipping Co. v. Sieracki, 328 U. S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. I find it hard to understand why the rationale of Lindgren v. United States, supra, ought not to have forbidden recovery in either of these instances. If the Jones Act "covers the entire field of liability for injuries to seamen" [281 U.S. 38, 50 S.Ct. 211] and "is paramount and exclusive," why does it not supersede injuries arising from unseaworthiness which do not result in death, as well as those which do? Nor can I see how it does not equally supersede *pro tanto* the Death on the High Seas Act. Yet I must own to the greatest doubt whether the Court would today so hold. All this seems to me too make it doubly important to learn whether the judge would have decided that the winch was unseaworthy, if he had not relied upon Archer's testimony; and, indeed, I should in any event have wished argument upon the point I have suggested before affirming.